# Exhibit H

NAME OF OFFEREE _____     NO. _____

<u>CONFIDENTIAL PRIVATE OFFERING MEMORANDUM</u>

# INCOME-PLUS INVESTMENT FUND
### (A Tax-Exempt Investment Fund Established
### pursuant to The Master Income-Plus Group Trust)

————————————

December 15, 1993

————————————

**INVESTMENT MANAGER:**
**J.P. JEANNERET ASSOCIATES, INC.**

**TRUSTEE:**
**CUSTODIAL TRUST COMPANY**

THIS OFFERING IS NOT A PUBLIC OFFERING.  THE SECURITIES OFFERED
HEREBY HAVE NOT BEEN REGISTERED OR QUALIFIED WITH, NOR APPROVED BY,
THE SECURITIES AND EXCHANGE COMMISSION OR ANY STATE REGULATORY
AUTHORITY, NOR HAS SUCH COMMISSION OR ANY REGULATORY AUTHORITY
PASSED UPON THE ACCURACY OR ADEQUACY OF THIS MEMORANDUM.   THIS
MEMORANDUM DOES NOT CONSTITUTE AN OFFER OR SOLICITATION IN ANY
JURISDICTION IN WHICH SUCH OFFER OR SOLICITATION IS NOT LAWFUL, OR
IN WHICH THE PERSON MAKING SUCH OFFER OR SOLICITATION IS NOT
QUALIFIED TO DO SO.

# INCOME-PLUS INVESTMENT FUND

CONFIDENTIAL PRIVATE OFFERING MEMORANDUM
FOR THE SALE OF UNITS ("UNITS")
OF THE INCOME-PLUS INVESTMENT FUND
FOR A MINIMUM INVESTMENT OF $500,000

The Units offered herein are of the Income-Plus Investment Fund ("Investment Fund"), which was established on December 15, 1993 pursuant to The Master Income-Plus Group Trust ("Group Trust"). The Group Trust is intended to be a tax-exempt "Group Trust" under Internal Revenue Service ("IRS") Revenue Ruling 81-100. The Investment Fund has been established to pool investment funds to be managed by a number of independent investment managers selected by J.P. Jeanneret Associates, Inc. ("Investment Manager").

NEITHER THE GROUP TRUST, INVESTMENT FUND, NOR THE UNITS WHICH ARE DESCRIBED IN THIS MEMORANDUM HAVE BEEN OR WILL BE REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED, THE INVESTMENT COMPANY ACT OF 1940, AS AMENDED, OR THE SECURITIES LAWS OF ANY OF THE STATES OF THE UNITED STATES. THE OFFERING CONTEMPLATED BY THIS MEMORANDUM IS BEING MADE IN RELIANCE UPON AN EXEMPTION FROM THE REGISTRATION REQUIREMENTS OF THE SECURITIES ACT OF 1933, AS AMENDED, FOR OFFERS AND SALES OF SECURITIES WHICH DO NOT INVOLVE ANY PUBLIC OFFERING AND ANALOGOUS EXEMPTIONS UNDER STATE SECURITIES LAWS.

PURCHASE OF THE UNITS, INVOLVES CERTAIN RISKS. SEE "RISK FACTORS", P. 11 TO P. 14.

THIS OFFERING INVOLVES CONFLICTS OF INTEREST. SEE "CONFLICTS OF INTEREST", P. 14 to P. 15.

THIS IS A PRIVATE OFFERING, MADE ONLY BY DELIVERY OF A COPY OF THIS MEMORANDUM TO THE PROSPECTIVE PARTICIPATING ENTITY WHOSE NAME APPEARS HEREON. UNITS MAY ONLY BE PURCHASED BY ENTITIES WHICH ARE TAX EXEMPT AND WHICH SATISFY THE ELIGIBILITY REQUIREMENTS SET FORTH IN THE SECTION OF THIS MEMORANDUM ENTITLED "ELIGIBILITY REQUIREMENTS", P. 22 TO P. 24.

THERE IS NO PUBLIC MARKET FOR THE UNITS OFFERED HEREIN AND NO UNIT MAY BE TRANSFERRED OR ASSIGNED. A PARTICIPATING ENTITY, HOWEVER, MAY WITHDRAW FROM THE INVESTMENT FUND AND RECEIVE PAYMENT FOR ITS UNITS AT SPECIFIED TIMES AS SET FORTH IN THE GROUP TRUST AGREEMENT.

Dated:  December 15, 1993

NO RULINGS HAVE BEEN SOUGHT FROM THE INTERNAL REVENUE SERVICE WITH RESPECT TO ANY TAX MATTERS, EXCEPT THAT THE INVESTMENT MANAGER HAS RECEIVED A FAVORABLE DETERMINATION LETTER FROM THE IRS THAT THE GROUP TRUST IS A "GROUP TRUST" UNDER IRS REVENUE RULING 81-100.

PROSPECTIVE PARTICIPATING ENTITIES ARE NOT TO CONSTRUE THE CONTENTS OF THIS MEMORANDUM AS LEGAL, TAX OR INVESTMENT ADVICE. PROSPECTIVE PARTICIPATING ENTITIES SHOULD REVIEW THE PROPOSED TRANSACTIONS WITH THEIR OWN COUNSEL, ACCOUNTANT, BUSINESS AND TAX ADVISOR ON WHOSE OPINIONS THEY SHOULD RELY. A REPRESENTATION TO THAT EFFECT IS REQUIRED TO BE MADE BY EACH PARTICIPATING ENTITY.

EACH PROSPECTIVE PARTICIPATING ENTITY WILL BE REQUIRED TO REPRESENT THAT IT IS ACQUIRING ITS UNITS FOR ITS OWN ACCOUNT, FOR INVESTMENT PURPOSES ONLY, AND NOT WITH ANY INTENTION OF DISTRIBUTION OR RESALE OR TRANSFER OF ITS UNITS, EITHER IN WHOLE OR IN PART, AND NO RESALE OR TRANSFER OF ITS UNITS WILL BE PERMITTED.

THIS MEMORANDUM IS SUBMITTED IN CONNECTION WITH THE PRIVATE PLACEMENT OF THE UNITS DESCRIBED HEREIN AND MAY NOT BE REPRODUCED OR USED FOR ANY OTHER PURPOSE. ANY DISTRIBUTION OF THIS MEMORANDUM IN WHOLE OR IN PART, OR THE DIVULGENCE OF ANY OF ITS CONTENTS, IS UNAUTHORIZED. THE PROSPECTIVE PARTICIPATING ENTITY, BY ACCEPTING DELIVERY OF THIS MEMORANDUM, AGREES TO RETURN THIS MEMORANDUM AND ALL ENCLOSED DOCUMENTS TO THE INVESTMENT MANAGER IF THE PROSPECTIVE PARTICIPATING ENTITY DOES NOT AGREE TO PURCHASE ANY OF THE UNITS OFFERED HEREBY.

NO OFFERING LITERATURE OR ADVERTISING IN WHATEVER FORM SHALL BE EMPLOYED IN THE OFFERING OF THE UNITS EXCEPT FOR THIS MEMORANDUM. NO PERSON HAS BEEN AUTHORIZED TO MAKE ANY REPRESENTATIONS, OR GIVE ANY INFORMATION, WITH RESPECT TO THE UNITS, EXCEPT THE INFORMATION CONTAINED HEREIN.

THIS PRIVATE PLACEMENT MEMORANDUM DOES NOT CONTAIN ANY UNTRUE STATEMENT OF A MATERIAL FACT OR OMIT TO STATE A MATERIAL FACT NECESSARY TO MAKE THE STATEMENTS MADE, IN LIGHT OF THE CIRCUMSTANCES UNDER WHICH THEY WERE MADE, NOT MISLEADING. IT CONTAINS A FAIR SUMMARY OF THE MATERIAL TERMS OF DOCUMENTS PURPORTED TO BE SUMMARIZED HEREIN.

EACH PROSPECTIVE PARTICIPATING ENTITY AND ITS REPRESENTATIVE(S), IF ANY, ARE INVITED TO ASK QUESTIONS AND OBTAIN ADDITIONAL INFORMATION FROM THE INVESTMENT MANAGER CONCERNING THE TERMS AND CONDITIONS OF THE OFFERING, THE INVESTMENT FUND AND THE GROUP TRUST, AND ANY OTHER RELEVANT MATTERS (INCLUDING BUT NOT LIMITED TO, ADDITIONAL INFORMATION TO VERIFY THE ACCURACY OF THE INFORMATION SET FORTH HEREIN) TO THE EXTENT THE INVESTMENT MANAGER POSSESSES SUCH INFORMATION OR CAN ACQUIRE IT WITHOUT UNREASONABLE EFFORT OR EXPENSE.

FOR NEW YORK PARTICIPATING ENTITIES:

THE SECURITIES BEING OFFERED HAVE NOT BEEN REGISTERED UNDER THE 1933 ACT OR UNDER THE NEW YORK STATE MARTIN ACT AND ARE BEING SOLD IN RELIANCE UPON THE EXEMPTION PROVIDED FOR IN SECTION 359-f(2)(d) OF SUCH ACT.

THIS PRIVATE PLACEMENT MEMORANDUM HAS NOT BEEN REVIEWED BY THE ATTORNEY GENERAL OF THE STATE OF NEW YORK PRIOR TO ITS ISSUANCE AND USE.  THE ATTORNEY GENERAL OF THE STATE OF NEW YORK HAS NOT PASSED ON OR ENDORSED THE MERITS OF THIS OFFERING.  ANY REPRESENTATION TO THE CONTRARY IS UNLAWFUL.

FOR NEW JERSEY PARTICIPATING ENTITIES:

THE SECURITIES BEING OFFERED HAVE NOT BEEN APPROVED OR DISAPPROVED BY THE BUREAU OF SECURITIES OF THE STATE OF NEW JERSEY NOR HAS THE BUREAU PASSED ON OR ENDORSED THE MERITS OF THE OFFERING.  ANY REPRESENTATION TO THE CONTRARY IS UNLAWFUL.  THE SECURITIES HAVE NOT BEEN REGISTERED AND ARE BEING SOLD IN RELIANCE UPON THE EXEMPTION CONTAINED IN SECTION 49:3-50(b)(12) OF THE NEW JERSEY SECURITIES LAW.

FOR FLORIDA PARTICIPATING ENTITIES:

THE SECURITIES OFFERED HEREBY HAVE NOT BEEN REGISTERED UNDER THE FLORIDA SECURITIES ACT.  EACH OFFEREE WHO IS A FLORIDA RESIDENT SHOULD BE AWARE THAT SECTION 517.061(11)(a)(5) OF THE FLORIDA SECURITIES ACT PROVIDES, IN RELEVANT PART, AS FOLLOWS: "... ANY SALE IN THIS STATE MADE PURSUANT TO THIS SUBSECTION ... IS VOIDABLE BY THE PURCHASER ... WITHIN THREE DAYS AFTER THE FIRST TENDER OF CONSIDERATION IS MADE BY THE PURCHASER TO THE ISSUER, AN AGENT OF THE ISSUER OR ANY ESCROW AGENT ..."  EACH OFFEREE ENTITLED TO EXERCISE THE RIGHT TO WITHDRAW GRANTED BY SECTION 517.061(11)(a)(5) AND WHICH WISHES TO EXERCISE SUCH RIGHT, MUST, WITHIN THREE DAYS AFTER THE TENDER OF THE FIRST INSTALLMENT OF ITS INVESTMENT TO THE INVESTMENT MANAGER, CAUSE A WRITTEN NOTICE OR TELEGRAM TO BE SENT TO THE INVESTMENT MANAGER.  SUCH LETTERS OR TELEGRAMS MUST BE SENT AND POSTMARKED ON OR PRIOR TO THE AFOREMENTIONED THIRD DAY.  IF AN INVESTOR CHOOSES TO WITHDRAW BY LETTER, IT IS PRUDENT TO SEND IT BY CERTIFIED MAIL, RETURN RECEIPT REQUESTED, TO ASSURE THAT IT IS RECEIVED AND ALSO TO EVIDENCE THE TIME WHEN IT WAS MAILED.  AN INVESTOR MAKING AN ORAL REQUEST FOR WITHDRAWAL MUST ASK FOR WRITTEN CONFIRMATION THAT THE REQUEST HAS BEEN RECEIVED.

TABLE OF CONTENTS

CAPTION                                                          PAGE

SUMMARY . . . . . . . . . . . . . . . . . . . . . . . . . . (v)

INTRODUCTION . . . . . . . . . . . . . . . . . . . . . . . 1

BUSINESS OF THE INVESTMENT FUND . . . . . . . . . . . . . . 4

ILLUSTRATIONS OF HEDGING AND ARBITRAGE STRATEGIES . . . . . . 6

MANAGEMENT OF THE INVESTMENT FUND . . . . . . . . . . . . . 8

ENGAGEMENT OF ADVISOR . . . . . . . . . . . . . . . . . . . 9

RISK FACTORS . . . . . . . . . . . . . . . . . . . . . . . 11

CONFLICTS OF INTEREST . . . . . . . . . . . . . . . . . . . 14

FINANCIAL SUMMARY OF THE OFFERING . . . . . . . . . . . . . 15

INCOME TAX ASPECTS . . . . . . . . . . . . . . . . . . . . 19

ERISA CONSIDERATIONS . . . . . . . . . . . . . . . . . . . 21

ELIGIBILITY REQUIREMENTS . . . . . . . . . . . . . . . . . 22

SUBSCRIPTION PROCEDURES . . . . . . . . . . . . . . . . . . 25

MISCELLANEOUS . . . . . . . . . . . . . . . . . . . . . . . 25

EXHIBITS

"A" Agreement of Trust Establishing Group Trust

"B" Adoption Agreement

"C" Declaration Establishing Income-Plus Investment Fund
    Under the Group Trust

(iv)

## SUMMARY

The following summary is intended to highlight certain information in the body of this Memorandum. Potential Participating Entities are urged to read carefully the entire Memorandum and Exhibits.

**Formation and Purpose**  Income-Plus Investment Fund ("Investment Fund") has been organized pursuant to The Master Income-Plus Group Trust ("Group Trust") to pool investment funds to be managed by a number of independent investment managers utilizing certain identified hedging and arbitrage strategies ("Designated Managers").

**Investment Manager**  J.P. Jeanneret Associates, Inc. and its predecessor, Dr. John P. Jeanneret (collectively, "Investment Manager"), based in Syracuse, New York, have been a registered investment advisor since 1974. The Investment Manager currently provides investment advice with respect to more than $200 million in assets. See "MANAGEMENT OF THE INVESTMENT FUND-The Investment Manager", P. 8 to P. 9. Investment Manager intends to delegate responsibility for management of substantially all of the assets of the Investment Fund to one or more Designated Managers.

**Advisor**  Ivy Asset Management Corp. ("Advisor"), based in Garden City, New York, manages and/or provides advice with respect to more than $300 million in assets. See "ENGAGEMENT OF ADVISOR", P. 9 to P. 10.

**Trustee**  Custodial Trust Company ("Trustee") is an FDIC insured New Jersey Bank based in Princeton, New Jersey. See "MANAGEMENT OF THE INVESTMENT FUND-The Trustee", P. 9.

**Fees and Expenses**  The Investment Fund will pay (a) the Investment Manager a quarter-annual management fee equal to .09375% and, (b) on behalf of the Investment Manager, the Advisor a quarter-annual advisory fee equal to .09375%, of the Investment Fund's net asset value (as adjusted for additions and withdrawals of funds) at

(v)

the end of each calendar quarter (collectively, "Base Fee"). The Investment Fund will also pay an additional fee ("Additional Fee") on an annual basis equal to 20% of the amount by which the percentage increase in the net asset value (as adjusted for additions and withdrawals of funds) of the Investment Fund during each calendar year, before deduction of the Additional Fee, exceeds the sum of (a) 10% less (b) the Base Fee. The Investment Fund will pay one-half (1/2) of such additional fee to the Investment Manager and will pay, on behalf of the Investment Manager, one-half (1/2) of such additional fee to the Advisor. See "FINANCIAL SUMMARY OF THE OFFERING", P. 15 to P. 19.

The payment of the fees to the Advisor is the sole obligation of the Investment Manager and the Investment Manager has given standing instructions to the Investment Fund to pay one-half (1/2) of all fees earned by the Investment Manager directly to the Advisor. The Advisor has agreed to look solely and exclusively to the Investment Manager for payment of its fees.

The Investment Fund also pays the fees and expenses of the Trustee, the Designated Managers, brokerage commissions, custodial, legal, auditing, accounting and other administrative expenses. The fees payable to the Trustee are .20% of the assets of the Investment Fund up to $100 million in assets and .15% of the assets of the Investment Fund in excess of $100 million in assets, but in no event less than $5,000 per year.

**End of Fiscal Year**      December 31

**Units Offered**      The Investment Fund is offering an unlimited number of units ("Units") at an initial offering price of $10,000 per unit. Generally, the minimum purchase by any eligible Participating Entity is $500,000 in whole or in fractional Units. The Investment Manager may, in its sole

(vi)

discretion, waive the minimum purchase requirement. The Investment Fund will have no more than 100 Participating Entities at any time.

**Valuation Date**

The last business day (in New York) of each calendar quarter or any other day that the Investment Manager determines.

**Net Asset Value**

After the initial offering, the Units are being offered at their net asset value, as determined as of the close of business in New York on the Valuation Date next following acceptance of the subscription.

**Suitability Standards**

Units may only be purchased by (herein referred to as a "Participating Entity" or "Participating Entities") (1) a pension or profit sharing trust which by qualifying under Internal Revenue Code of 1986, as amended (the "Code") Section 401(a) is exempt from taxation under Code Section 501(a), (2) a plan or governmental unit described in .Code Sections 401(a)(24) and 818(a)(6), or (3) an individual retirement account exempt under Code Section 408(e). In addition, Units may only be purchased by Accredited Investors (as defined below) and up to 35 Sophisticated Investors (as defined below). See "ELIGIBILITY REQUIREMENTS", P. 22 to P. 24. The Investment Manager may, in its sole discretion, reject any subscription.

**Subscription Procedure**

To purchase Units, a prospective Participating Entity must complete, execute and return to the Investment Manager a copy of the Adoption Agreement and Participating Entity Information Statement at least 15 days before the relevant Valuation Date and arrange for receipt of the full purchase price by the Investment Fund on or before the relevant Valuation Date. Wire transfer instructions appear below under "SUBSCRIPTION PROCEDURES", P. 25.

**Distributions**

Investment Fund income and gains are automatically reinvested.

(vii)

| | |
|---|---|
| **Redemption** | Redemption of Units by Participating Entities may be made as of the close of business in New York on the last business day of June and December of each calendar year upon at least 45 days prior written notice to the Investment Manager. Mandatory redemptions by the Investment Manager are permitted in certain circumstances. All redemptions will be at the net asset value per Unit on the Redemption Date, adjusted as described above under "Net Asset Value". All redemptions will be paid as promptly as reasonably practicable after the Redemption Date, subject to the Investment Manager's right to defer payment in certain limited circumstances. See "FINANCIAL SUMMARY OF THE OFFERING", P. 15 to P. 19. |
| **Assignment and Transfer of Units** | The assignability and transferability of Units is prohibited. There is and will be no public or private market (primary or secondary) for the Units. |
| **Certain Federal Income Tax Consequences** | The Group Trust is intended to meet the requirements of an exempt group trust within the meaning of Revenue Ruling 81-100, IRB 1981-13, in which event the Investment Fund will not be subject to Federal income taxation and an eligible Participating Entity's tax-exempt status will not be affected by its investment in the Investment Fund. However, the Group Trust, and not the Participating Entities, will be subject to unrelated business taxable income ("UBTI") in excess of $1,000. See "INCOME TAX ASPECTS", P. 19 to P. 21. |
| **Auditors** | Goldstein Golub Kessler & Company P.C., New York, New York |
| **Additional Information** | Contact J.P. Jeanneret Associates, Inc., 100 East Washington Street, Syracuse, New York 13202, telephone number (315) 478-2770 and facsimile number (315) 478-3043, Attn: John P. Jeanneret. |

(viii)

PROSPECTIVE PURCHASERS OF UNITS ARE NOT TO CONSTRUE THE CONTENTS OF THIS CONFIDENTIAL PRIVATE OFFERING MEMORANDUM AS LEGAL OR TAX ADVICE.   EACH ELIGIBLE PARTICIPATING ENTITY SHOULD CONSULT WITH PROFESSIONAL ADVISORS AS TO LEGAL, TAX AND RELATED MATTERS CONCERNING AN INVESTMENT IN THE INVESTMENT FUND.

## INTRODUCTION

Income-Plus Investment Fund, a tax-exempt group trust ("Investment Fund"), has been formed by the Investment Manager (as defined below) to pool and commingle certain of the assets of certain qualifying employee pension and profit sharing plans or certain other entities, including exempt individual retirement accounts, all of which are either Accredited Investors and Sophisticated Investors (collectively "Participating Entities") for investment purposes only.  The Investment Fund was established on December 15, 1993 pursuant to The Master Income-Plus Group Trust ("Group Trust").  The Group Trust was formed on February 23, 1993 pursuant to an Agreement of Trust Establishing The Master Income-Plus Group Trust ("Trust Agreement") between the Trustee and the Investment Manager.  The Trust Agreement provides that the Investment Manager may from time to time establish group trust funds by executing and delivering to the Trustee a Declaration Establishing Investment Fund under the Group Trust ("Declaration"). The Investment Fund is a group trust fund established by the Investment Manager pursuant to such a Declaration.

The Investment Manager, together with its Advisor (as defined below), have identified a number of hedging and arbitrage strategies utilized by Designated Managers with whom the Investment Manager intends to invest substantially all of the assets of the Investment Fund.  These Designated Managers, either through directly-managed accounts or through their own partnership within which the Investment Fund would participate, employ varying investment styles and strategies.  These include convertible hedging, basis and spread trading, conversions and reversals and relative value trading.  Future investments may also be made with Designated Managers employing other hedging and arbitrage strategies involving stocks, bonds, options on stocks and other financial instruments.  While it is anticipated that a substantial portion of the assets of the Investment Fund will be invested with Designated Managers recommended to the Investment Manager by the Advisor, all decisions regarding the investment, maintenance and withdrawal of Investment Fund assets will be made by the Investment Manager in its sole and absolute discretion.  The Investment Manager may directly manage up to ten (10%) percent of the assets of the Investment Fund.

The Investment Fund's prime objective is to provide returns substantially higher than the risk-free rate of return (i.e., Treasury Bills), while attempting to minimize risk.  It is the intention of the Investment Manager to diversify the assets of the Group Trust among numerous Designated Managers, and to allocate assets within the Investment Fund such that they are reasonably diversified among different Designated Managers and investment strategies, in order to minimize the risk of one strategy adversely effecting the investment return.  Hedging and arbitrage strategies are not intended to profit by taking "market risk".  The Investment

-1-

Manager believes that the objective of consistent capital growth can be achieved with diversified asset management utilizing hedging and arbitrage strategies and employing managers utilizing the same or varied strategies that seek to profit from pricing inefficiencies. However, no assurance can be given that these objectives will be achieved.

The Investment Manager has determined that there are various hedging and arbitrage managers available to clients with high net worth, or managers which require large minimum accounts under management or large investments in partnerships they control, which are not available to some pension and profit sharing plans and individual retirement accounts. Also, the Investment Manager recognizes the benefits of diversification of assets of such entities among several hedging managers, and the economies that can be realized from management of a large pool of assets in the Group Trust. The Investment Manager believes that satisfactory rates of return can be achieved on a consistent basis through various hedging and arbitrage strategies, which have been thoroughly researched by the Investment Manager and its Advisor, Ivy Asset Management Corp. As such, the Income Plus Investment Fund represents a vehicle for achievement of relatively consistent higher rates of return on pension and profit sharing plans and individual retirement accounts from year to year than the risk-free rate of return (i.e. Treasury Bills).

J.P. Jeanneret Associates, Inc., with an address at 100 East Washington Street, Syracuse, New York 13202, is the investment manager ("Investment Manager"). The Investment Manager (and its predecessor) has been registered as an investment advisor under the Investment Advisers Act of 1940, as amended ("Adviser's Act") since 1974 and is the "investment manager" for the Group Trust and Investment Fund within the meaning of Section 3(38) of the Employee Retirement Income Security Act of 1974, as amended ("ERISA"). The Investment Manager is also a Qualified Professional Asset Manager ("QPAM"). Investment Manager provides investment advice with respect to over $200 million in assets. Dr. John P. Jeanneret is the sole shareholder of the Investment Manager. He is its chief executive officer, and he serves with Matthew C. McCabe and Paul L. Perry as directors of the Investment Manager.

The Investment Fund will initially pay (a) the Investment Manager a quarter-annual fee equal to .09375% and, (b) on behalf of the Investment Manager, the Advisor a quarter-annual advisory fee equal to .09375%, of the value of the Investment Fund (as adjusted for additions and withdrawals of funds) at the end of each fiscal quarter (collectively, "Base Fee"). The Investment Fund will also pay an additional annual fee ("Additional Fee") equal to twenty (20%) percent of the amount by which the percentage increase in value of the Investment Fund (as adjusted for additions and withdrawals of funds) during each calendar year, before deduction of the Additional Fee, exceeds the sum of (a) 10% less (b) the Base

-2-

Fee.   The Additional Fee will be paid one-half (1/2) to the Investment Manager and, on behalf of the Investment Manager, one-half (1/2) to the Advisor.  The payment of the fees to the Advisor is the sole obligation of the Investment Manager and the Investment Manager has given standing instructions to the Investment Fund to pay one-half (1/2) of all fees earned by the Investment Manager directly to the Advisor.  The Advisor has agreed to look solely and exclusively to the Investment Manager for payment of its fees. SEE "FINANCIAL SUMMARY OF THE OFFERING - Fees and Expenses of Investment Fund", P. 16 to P. 18.  The fees and expenses of the Trustee, Designated Managers, brokerage commissions, legal, audit, accounting and other administration expenses of the Investment Fund will be paid out of the assets of the Investment Fund.  The Investment Manager will not receive any additional fees or other compensation with respect to the assets of the Investment Fund that it directly manages (limited to up to ten (10%) percent) except the Base Fee and Additional Fee that the Investment Fund will pay it.

The Trustee is an FDIC insured New Jersey bank located in Princeton, New Jersey, and is wholly-owned by The Bear Stearns Companies Inc.  The Trustee commenced operations in September 1985 and is currently in its ninth year of operation.  The Trustee holds, as custodian or trustee, over $16 billion in unaffiliated customer assets.  The Trustee's customers include public and private pension funds, mutual funds, endowments and insurance companies.  The Trustee also holds over $18 billion of assets from affiliated entities.  The Trustee has over $100 million of capital which is invested principally in short-term securities.   The Trustee is the largest securities clearance customer of the Philadelphia Federal Reserve Bank district (accounting for 70% of the total volume cleared) and is one of the largest trust and custody banks in New Jersey.

On May 15, 1991, Investment Manager entered into an advisory agreement with Ivy Asset Management Corp., a Delaware corporation ("Advisor"), with an address at 591 Stewart Avenue, Suite 550, Garden City, New York 11530.  The advisory agreement was amended as of December 1, 1992 to take into account the organization of the Group Trust and Investment Fund by the Investment Manager and to provide that the Advisor initially will receive 50% of the fees received by Investment Manager from the Group Trust and Investment Fund.  The advisory agreement, as amended, provides that Advisor will make recommendations to Investment Manager as to potential Designated Managers that Investment Manager may invest its clients' fund with.  Advisor is also required to monitor and periodically evaluate all investments made by Investment Manager of its clients' funds with investment managers it recommends.   Advisor is not registered as an investment advisor under the Adviser's Act in reliance upon an exemption set forth therein.  Lawrence J. Simon and Howard Wohl are the President and Vice President, respectively, of Advisor, and its sole directors, and they and their respective immediate families are the sole shareholders of Advisor.

-3-

## BUSINESS OF THE INVESTMENT FUND

Following are brief summaries of hedging and arbitrage strategies to be utilized by the Investment Manager in investing the assets of the Investment Fund:

1. <u>Convertible Hedging (and Arbitrage)</u>. Convertible hedging involves the simultaneous purchase and short sale of issues of the same corporation. The hedger purchases the undervalued issue and sells short the overvalued issue. Convertible hedging and arbitrage activities may involve convertible bonds, convertible preferred stock, warrants and rights. Often, the hedge involves the purchase of a convertible bond issued by a corporation and the short sale of that corporation's common stock. The convertible bond generally has a higher rate of return, carries the corporation's legal obligation to redeem at a pre-determined future date, and places its owner in a higher legal standing, as creditor, than the common shareholders, should problems arise with the corporation. Therefore, the convertible bond has greater intrinsic value and has the ability to increase in value as the common stock price rises toward, and above, the conversion price. The hedger would purchase the bond when its "premium", the excess of its price over the conversion value, is relatively low. If the common stock price were to decline, it would likely fall at a greater percentage than the bond. If the common stock price were to rise the bond's conversion price would increase, as well. Since there is a difference in amplitude between the relative increases in price, hedges are generally established by varying the proportion of the respective long and short positions.

Convertible arbitrage is the purchase of a position for a lesser amount than the amount received on the short sale of the convertible position. The arbitrager then converts his long position and closes the short position. The gain has essentially been "locked in" at the time that these simultaneous transactions take place.

Among the risks involved are credit deterioration of the bond that is reflected more in the price of the bond than in the price of the stock; interest rate risk, wherein rising interest rates reduce the value of the fixed interest bearing bond, while the stock price is not as greatly affected; and premature call of the bond, often the result of merger and acquisition activity, which eliminates the "premium" generally accruing to the bond.

2. <u>Basis and Spread Trading</u>. Basis and spread trading attempts to take advantage of discrepancies in pricing among related issues. Spread trading can involve puts and calls of the same stock at various strike prices and/or months of expiration. Spread trading can also involve regulated futures contracts with differing months of delivery. The hedger attempts to purchase the undervalued side of the spread and to simultaneously sell short the

-4-

overvalued side.

As part of the hedger's calculations, he will determine the probable profit and loss for all potential outcomes.   These will include an extreme rise or fall in the price of the underlying stock or commodity.   He will establish a hedge that nullifies, as much as possible, the risk of loss due to price changes.   His goal is to capture the perceived price discrepancy over time.

Spread trading may also involve the use of stock index futures and a "market basket" of securities.   The market basket is created to replicate, as nearly as possible, the underlying stocks which are used to calculate the stock index.   When the futures are underpriced, trading at a discount to their calculated value, they will be purchased while the market basket will be sold short.   When the futures are overpriced, they will be sold while the market basket is purchased.   The goal is to capture the difference provided by the market's disequilibrium.

Basis trading involves the use of financial futures and seeks to capture the yield discrepancies between futures of Treasury Bills, Treasury Bonds and Government-backed mortgages, and their respective actual instruments.   Where a high return is indicated by the mispricing of a futures contract, the hedger will simultaneously take an opposite position regarding the deliverable security.   He will arrange for any financing that is required, and expect that over time the discrepancy will be captured as profit.

3.   <u>Conversions and Reversals</u>.   Conversions involve the purchase of a stock hedged by a combination of a call and a put which is the equivalent of the short sale of that stock.   Reverse conversions involve the short sale of a stock hedged by a combination of a call and a put which is the equivalent of the purchase of that stock.   Profit from conversions and reverse conversions is based upon the price discrepancies between the put, call and common stock.   In addition, profit is enhanced by the difference between the potential return and the current rate of interest.   By purchasing stock, and hedging with options, the hedger is lending money and expecting to make more money on the loan than the cost of the conversion.   By selling stock, the hedger becomes a borrower and expects to earn more money on the reverse conversion than he will be charged.

4.   <u>Relative Value Trading</u>.   Relative value trading involves the simultaneous purchase of a long position and the sale of a short position, where the net position established is considered to be undervalued.   Such trading can involve the purchase and sale of differing debt issues of an individual company.   The hedger attempts to find a discrepancy in valuation between these two issues, where a senior issue, for example, should be trading at a greater differential than a junior issue of the same company.   By simultaneously trading issues of the same company, he substantially

-5-

eliminates the risk of the company's activities causing a decline
in price of its issues.

## ILLUSTRATIONS OF HEDGING AND ARBITRAGE STRATEGIES

### Convertible Hedging

Purchase $250,000 Medical Care International 7% Bond due August 1, 2015
    @ 129.50
Sell Short 4,400 shares Medical Care International Common Stock
    @ 60

The Medical Care International bond is convertible into shares of
the Company's common stock. The ratio is 20.672 shares per $1,000
bond.   The $250,000 bonds are convertible into 5,168 shares of
common stock.  The short sale of 4,400 shares represents a hedge
ratio of approximately 85%. Therefore, the long exposure of owning
the bond is largely eliminated.   The value of the bond, if
converted into common stock selling at $60 per share, is about
$124.   The difference of $5.50 per bond is the premium paid to
establish the hedge.

The bond should normally sell at a premium to the exercise price
because it pays interest.  In addition, through its conversion
feature, it represents the equivalent of a call on the stock.
Should the price of the stock decline by a considerable amount,
theoretically the bond should increase in its relative value, since
it is a credit instrument.  Besides offering a hedge, the short
sale of stock adds to the income stream.  Professional traders
generally receive a rebate of the interest earned by the selling
broker from the proceeds of the short sale.  This significantly
increases the return to the manager. Profit can also be made from
widening of the premium, or increased volatility of the stock.

### Basis Trading

Purchase  $2,000,000 United States Treasury Bills due 4/18/92 @ 4.11%
Sell Short 2 November Treasury Bills futures contract @ 4.02% (95.98)

The Treasury Bills futures contract calls for a delivery of a
$2,000,000 91-day Treasury Bill.  Therefore, the long and short
exposure is essentially the same, as the April 18 Treasury Bill can
be used to fulfill the futures delivery requirement.   The trade
takes advantage of the differential (the "basis") between the
futures market and the cash market.

The profit is a slight increment over the risk-free rate of return
earned by purchasing only the Treasury Bill.  Alternatively, the
trade can be financed.  If money can be borrowed at a rate below
4.11%, the profit is earned on a minimal net investment, making the
percentage return much higher.

## Spread Trading

| | | |
|---|---|---|
| Purchase | 20 March Comex Silver futures contracts | @ 350.00 |
| Sell Short | 20 July Comex Silver futures contracts | @ 500.00 |

The manager has entered into this spread because he has determined that the premium of $1.50 is higher than dictated by interest rates and other carrying charges. The long and short exposure is essentially the same, since each contract calls for delivery of the same number of ounces. Whether the price of silver rises or falls, he expects the spread to narrow, and to profit from that change. In this instance, there is the same underlying commodity and the relationship should be dictated by a limited number of factors. Other spread trading may involve related instruments, where historical pricing relationships may become distorted and present opportunities for hedging.

Three months later the manager closes the positions when the premium has been reduced to $0.75. His profit is $1,500. His investment is the margin required for the transaction.

Alternatively, he might protect himself further against a significant rise in the price of silver, and the subsequent increase in the absolute dollar amount of the premium, by purchasing more contracts than he has sold. That limits the profit on the downside but protects against a loss on the upside.

## Reverse Conversions

| | | |
|---|---|---|
| Sell Short | 2,000 Digital Equipment Corporation Common Stock | @ 64.50 |
| Purchase | 20 Digital Equipment May 65 calls | @ 4.50 |
| Sell Short | 20 Digital Equipment May 65 puts | @ 5.125 |

Whether the stock closes above 65, and will be covered by exercising the call, or closes below 65, and will be covered by assignment of the put, the stock will be sold for $65 per share. There will be a loss of $1,000 on the stock, offset by a net premium of $1,250 on the options, or a net profit on the combined trades of $250. In addition, the proceeds of the short sale will be credited with interest earned for the period, at the rate of approximately $15 a day. The profit percentage will increase with the length of time until expiration. The investor must also weigh the possibility that the stock may go ex-dividend during the period these positions are held.

Alternatively, the position may be set up as a conversion, with ownership of the stock paired with a purchase of the put and concomitant sale of the call. In that case, profits are made based upon receiving the stock's cash dividend, or an increase in value of the put option, based upon an increase in its implied volatility.

-7-

Relative Value Trading

| Buy | $100,000 RJR Senior Deferred Coupon Bond | |
| | due December 15, 1997 | @ 14.50% yield |
| Sell Short | $100,000 RJR Junior Coupon Bond | |
| | due December 15, 2002 | @ 13.63% yield |

The manager has purchased a senior credit issue yielding a higher rate of return than a more junior issue. The hedge protects against a potential deterioration in RJR's credit quality. If credit quality should deteriorate, the Junior bond should fall in price at a greater rate. If credit quality improves, the discrepancy in price should narrow. Either way a profit should be realized.

### MANAGEMENT OF THE INVESTMENT FUND

#### The Investment Manager

The Investment Manager is responsible for the management of the assets of the Investment Fund. The Investment Manager was organized in 1988 as a New York corporation and is currently wholly-owned by John P. Jeanneret, who is its Chief Executive Officer. The Investment Manager (and its predecessor) has served as an "investment manager" for pension and profit sharing plans, as well as numerous other types of employee benefit plans, within the meaning of Section 3(38) of ERISA since 1974. Investment Manager is also a Qualified Professional Asset Manager ("QPAM"). Currently, the Investment Manager serves approximately 55 employee benefit funds as an "investment manager". The Investment Manager's predecessor became a registered investment adviser under the Adviser's Act in 1974. The Investment Manager provides investment advice with respect to more than $200 million in discretionary assets. In addition, the Investment Manager serves as investment consultant and/or adviser to additional pension and profit-sharing plans having assets in excess of $500 million. See "CONFLICTS OF INTEREST", P. 14 to P. 15.

Dr. Jeanneret is 49 years old, and he resides in Syracuse, New York. Dr. Jeanneret was awarded the degrees of Doctor of Philosophy, Economics and Finance, at the State University of New York at Binghamton, in May 1976 and has served in the investment advisory and consulting field relating to employee benefit funds since 1973. Dr. Jeanneret was previously affiliated with B&K Employee Benefit Funds Service, a firm located in Syracuse, New York, providing investment advisory and administrative services to employee benefit plans. Matthew C. McCabe, a director and employee of the Investment Manager, was awarded a Master's in Business Administration and Law Degrees from Syracuse University in 1986. Mr. McCabe has been working in the legal and investment advisory area involving employee benefit plans for the past seven years. Paul L. Perry, a director and employee of the Investment Manager,

-8-

is a graduate of New York University, with degrees in Finance and in Quantitative Analysis. Mr. Perry served as a Registered Representative with Shearson Lehman Brothers, Inc. and Gruntal and Company, before joining the Investment Manager in 1988.

## The Trustee

The Trustee is an FDIC-insured New Jersey bank located in Princeton, New Jersey, and is wholly-owned by The Bear Stearns Companies Inc. The Trustee commenced operations in September 1985 and is in its ninth year of operation. The Trustee holds, as custodian or trustee, over $16 billion in unaffiliated customer assets. The Trustee's customers include public and private pension funds, mutual funds, endowments and insurance companies. The Trustee also holds over $18 billion of assets from affiliated entities. The Trustee has over $100 million of capital which is invested principally in short-term securities. The Trustee is the largest securities clearance customer of the Philadelphia Federal Reserve Bank district (accounting for 70% of the total volume cleared) and is one of the largest trust and custody banks in New Jersey. The Trustee's focus is purely institutional and it has no retail business. The Trustee provides two major types of service: (1) fiduciary, custody and agency services for institutional accounts such as domestic and international employee benefit plans, public retirement funds, mutual funds, insurance companies, foundations, endowments, religious institutions and other substantial accounts, and (2) all securities clearance, including clearing of government, mortgage and asset-backed securities transactions.

### ENGAGEMENT OF ADVISOR

On May 15, 1991, Investment Manager engaged Advisor as its investment advisor. The initial engagement agreement was amended as of December 1, 1992 (hereinafter, collectively, the "Engagement Agreement") principally to take into account the organization of the Group Trust and Investment Fund by the Investment Manager. The Engagement Agreement between the Investment Manager and Advisor runs through December 31, 2012 and is automatically renewable thereafter on a year to year basis unless cancelled by either party on at least 90 days written notice prior to the beginning of the next year term.

Under the Engagement Agreement, Advisor has agreed, with respect to the Investment Manager's management of the assets of the Investment Fund, to (i) research, evaluate and meet with potential investment managers of the assets of the Investment Fund, (ii) make recommendations to the Investment Manager that it invest assets of the Investment Fund with certain investment managers by investing in partnerships operated by such investment managers and/or by opening up directly-managed accounts with such investment managers, and (iii) monitor, evaluate and assess performance of investment

managers that are managing assets of the Investment Fund and to make periodic recommendations to Investment Manager with respect to such performance.  All advice provided by Advisor shall be made solely to Investment Manager and all decisions regarding assets of the Investment Fund are made by the Investment Manager in its sole and absolute discretion.  For its services to Investment Manager in connection with the management of the assets of the Investment Fund, Advisor will initially receive 50% of the fees that Investment Manager receives from the Group Trust, including the Investment Fund.

Advisor was organized in 1984 as a Delaware corporation and is wholly-owned by Lawrence J. Simon and Howard Wohl and their immediate families.  Messrs. Simon and Wohl are the president and vice president, respectively, of Advisor and are its only directors.  Advisor, Simon and Wohl are the general partners of Birchwood Associates, Oakwood Associates and Rosewood Associates, each of which is an investment partnership.  Advisor also acts as an investment advisor to several other independent entities, including the Investment Manager.  Advisor currently has under management and/or provides advice with respect to over $300 million in assets.  Birchwood Associates was organized in 1984 and is a multi-manager investment limited partnership which invests in four specialized investment areas.  In 1987, Oakwood Associates was organized as a multi-manager investment limited partnership which invests funds of tax-exempt entities.  In 1988, Rosewood Associates was formed as a multi-manager investment limited partnership whose primary objective is to seek above average rates of return while attempting to minimize risk by engaging independent investment managers who employ hedging and arbitrage strategies.  See "CONFLICTS OF INTEREST", P. 14 to P. 15.

Lawrence J. Simon, 50 years old, and Howard Wohl, 49 years old, have, since 1984, devoted their time to the operations of the three investment limited partnerships noted above and to providing investment advisory services to several other independent entities, including the Investment Manager.  They were co-founders of Wall Street Concepts, Inc., a computerized investment security record-keeping and performance measurement system, which firm was acquired by The Monchik-Weber Corp. ("Monchik"), a computer services and consulting firm servicing primarily the financial services industry.  Monchik was subsequently acquired by McGraw-Hill. Messrs. Simon and Wohl served as Vice President-Corporate Development and Acquisitions, and as Vice President-Finance, Treasurer and Chief Financial Officer, respectively, of Monchik.

RISK FACTORS

~~THE PURCHASE OF THE UNITS OFFERED HEREBY INVOLVES CERTAIN~~
RISKS AND IS SUITABLE ONLY FOR ENTITIES OF ADEQUATE FINANCIAL MEANS
WHICH HAVE NO NEED FOR LIQUIDITY IN THIS INVESTMENT.   PROSPECTIVE
PARTICIPATING ENTITIES SHOULD BEAR IN MIND THE FOLLOWING RISK
FACTORS.

## Market Risks

1.  <u>Competition</u>.  The securities industry, and the varied
    strategies to be engaged in by the Designated Managers
    selected by the Investment Manager are extremely competitive
    and each involves a degree of risk.  The Investment Fund,
    Investment Manager and the Designated Managers selected by
    the Investment Manager to manage funds of the Investment
    Fund will compete with firms, including many of the larger
    securities and investment banking firms, which have
    substantially greater financial resources and research
    staffs.

2.  <u>Market Volatility</u>.  The appreciation in the assets of the
    Investment Fund substantially depends upon the Designated
    Managers chosen by the Investment Manager correctly
    assessing the related future price movements of stocks,
    bonds and options on stocks and regulated futures contracts
    employed as part of a hedge.  There can be no assurance that
    the various Designated Managers selected by the Investment
    Manager will be successful in accurately predicting related
    price movements.

3.  <u>Leverage</u>.   The Designated Managers selected by the
    Investment Manager may employ leverage.  This includes the
    use of borrowed funds and investments in options, such as
    puts and calls, regulated futures contracts and warrants.
    Also, they may engage in short-sales, though it is intended
    that these be done as an integral part of their hedging
    transactions. While such techniques increase the opportunity
    to achieve higher returns on the amounts invested, they also
    increase the risk of loss.   The level of interest rates
    generally, and the rates at which such funds may be borrowed
    in particular, could affect the operating results of the
    Investment Fund.  Prospective Participating Entities should
    consider whether their organizational documents permit trust
    assets to be used for such purposes.

4.  <u>Liquidity</u>.  Some of the investments that are made by the
    Investment Fund may lack liquidity.  Though it is intended
    that all investments made by Designated Managers selected by
    the  Investment  Manager  will  be  in  publicly-traded
    investments, most of which will be on listed exchanges, some
    may be thinly traded.   This could present a problem in

-11-

realizing the prices quoted and in effectively trading the position(s). In addition, partnerships managed by Designated Managers selected by Investment Manager may restrict the ability of a partner to withdraw from the partnership.

5.      <u>Independence of Designated Managers</u>. Neither the Investment Fund, Investment Manager nor Advisor will have any control over any of the Designated Managers that are selected by the Investment Manager to manage assets of the Investment Fund, their choice of investments and other investment decisions, which are totally within the control of such Designated Managers. The Investment Manager, however, shall monitor the activities of all Designated Managers selected by Investment Manager. The Investment Manager shall have a fiduciary responsibility to review the performance of all selected Designated Managers and shall exercise due diligence in the selection and monitoring of such managers.

<u>Regulatory Risks</u>

1.      <u>Strategy Restrictions</u>. Certain prospective Participating Entities may be restricted from utilizing investment strategies of the type that the Investment Manager intends to engage in on behalf of the Investment Fund. The strategies involve hedged transactions. These may include purchases and sales of put and call options on stocks, and purchases and sales of regulated futures contracts. Prospective Participating Entities should consult their own advisors, counsel and accountants.

2.      <u>Trading Limitations</u>. For all securities, including options and regulated futures contracts, listed on a public exchange, the exchange generally has the right to suspend or limit trading under certain circumstances. Such suspensions or limits could render certain strategies difficult to complete or continue and subject the Investment Fund to loss.

<u>Investment Fund Risks</u>

1.      <u>Limited Liquidity</u>. An investment in the Investment Fund provides limited liquidity. The Units may not be sold or transferred. In connection with this offering, a Participating Entity must represent that it has acquired its Units for investment purposes only and not with a view to or for resale, distribution or fractionalization of the Units. The Units have not been registered under the Securities Act of 1933.

2.      <u>Withdrawal of Investment</u>. Participating Entities may withdraw all or any part of their investment from the

-12-

Investment Fund, upon at least 45 days prior written notice, as of the last business day of June and December of each calendar year.

3.  <u>Frequency of Trading</u>.  Some of the strategies employed by the Designated Managers selected by the Investment Manager to manage assets of the Investment Fund may require frequent trades to take place and, as a consequence, portfolio turnover or brokerage commissions may be greater than for other investment entities of similar size.

4.  <u>Fees and Expenses</u>.  The operating expenses of the Group Trust and Investment Fund, including the fees paid to the Trustee and Investment Manager and to the Designated Managers (often based upon performance) may, in the aggregate, constitute a high percentage relative to other investment entities.

5.  <u>Equity Allocation</u>.  While the Investment Manager intends to allocate the assets of the Investment Fund among a number of Designated Managers with differing strategies, there are no fixed allotments.  There is the risk that one of the strategies may have a disproportionate share of the assets of the Investment Fund.

6.  <u>No Participation in Management</u>.  The management of the Group Trust and Investment Fund's business will be vested solely in the Investment Manager and the Trustee, and the Participating Entities will have no right to take part in the conduct or control of the businesses of the Group Trust or Investment Fund.  In connection with the management of the Group Trust and Investment Fund's businesses, the Investment Manager and the Trustee, respectively, will provide services to the Group Trust and Investment Fund and devote thereto such time in their discretion as they deem appropriate.  See "CONFLICTS OF INTEREST", P. 14 to P 15.

7.  <u>Indemnification and Liability for False Information and Non-Compliance by Participating Entities</u>.  Under ERISA, the Investment Manager is a fiduciary and, consequently, is required to exercise good faith and integrity in operating the Investment Fund.  The Adoption Agreement annexed hereto as Exhibit B provides that each Participating Entity will, to the extent permitted by law, indemnify and hold harmless the Investment Manager, Advisor, Group Trust, Investment Fund and Trustee from and against losses, liabilities and claims of liability to which any of them may be subject as a result of any misrepresentation by such Participating Entity under the Adoption Agreement or the failure of such Participating Entity to comply with the terms and conditions of the Group Trust Agreement and Adoption Agreement. Furthermore, the Group Trust Agreement provides that the

-13-

Investment Manager will not be liable for losses sustained by the Investment Fund unless it is proved that it failed to act with the degree of care, skill, prudence, and diligence of a fiduciary under ERISA. The Group Trust Agreement provides that, to the extent permitted by law, the Group Trust will indemnify and hold harmless Trustee from and against losses, costs, and charges that Trustee may incur by reason of any Participating Entity or the Investment Manager or any other person acting in relation to the Group Trust, except where such loss, cost and/or damages arose out of the negligence, bad faith or willful misconduct of the Trustee.

8. <u>Management of Investment Fund Assets by Investment Manager</u>. The Investment Manager may directly manage up to ten (10%) percent of the assets of the Investment Fund. No assurance can be given nor should any be implied that the Investment Manager will increase the value of Investment Fund assets under direct management or that such assets will not diminish in value.

CONFLICTS OF INTEREST

There may be inherent and potential conflicts of interest between the Investment Manager, Advisor and the Investment Fund. Among the conflicts which should be considered are the following:

<u>With Respect to the Investment Manager</u>:

(a) The Investment Manager is not under any obligation to devote its full time to the business of the Investment Fund, but is only required to devote such time and attention to the affairs of the Investment Fund as it may deem appropriate. In addition, the Investment Manager manages other accounts and provides investment advice to others for which it is compensated.

(b) The Investment Manager will determine the allocation of funds from the Investment Fund and such other accounts to Designated Managers on whatever basis it considers appropriate or desirable. It is the intention of the Investment Manager to diversify the assets of the Investment Fund among various hedging strategies and Designated Managers.

(c) The Investment Manager manages other accounts, and it may decide to invest the funds of one or more other accounts, rather than the Investment Fund's funds, with a particular investment manager.

(d) The Additional Fee arrangement may create an incentive for the Investment Manager to make investments that are riskier or more speculative and which would generate a

-14-

higher return than would be the case in the absence of such a performance fee arrangement.

With Respect to the Advisor:

(a) The Advisor, through the three (3) investment limited partnerships of which it is presently a general partner and through the funds of the independent entities to which it acts as investment advisor, may utilize the services of investment managers which may also invest assets of the Investment Fund.

(b) The recommendations of the Advisor may be affected by its own requirements for the investment of funds of partnerships or other accounts managed or advised by it. This may result from limitations as to the amount of funds that a specific investment manager may effectively invest as well as other considerations.

(c) The Advisor manages and provides advice to other accounts, and it may decide to invest the funds of one or more partnerships or accounts managed by it with a particular investment manager, rather than recommending such investment manager to the Investment Manager. The Advisor will recommend investment managers to the Investment Manager on whatever basis it determines appropriate or desirable.

(d) The Advisor and its principals are not restricted by an agreement not to compete with the Investment Fund, Group Trust or Investment Manager or not to render investment advisory services to others. This may result in various conflicts of interest between the Advisor and the Investment Manager.

### FINANCIAL SUMMARY OF THE OFFERING

This summary is qualified in its entirety by the detailed information (including "RISK FACTORS") appearing in this Memorandum, in the Exhibits and in the documents referred to herein. All documents referred to herein and not attached hereto are available for inspection during normal business hours at the office of the Investment Manager, 100 East Washington Street, Syracuse, New York 13202, upon request by a Participating Entity or its representative.

### The Investment Fund

The Units offered herein of the Investment Fund, which was established on December 15, 1993 pursuant to the terms of the Trust Agreement, will represent the beneficial interest of each Participating Entity in the Investment Fund. The Trustee will maintain an account to which shall be credited the number of Units

-15-

allocated to each Participating Entity. Each Unit shall have a proportionate interest in the Investment Fund and no Unit shall have priority or preference over any other.

Each Participating Entity must invest a minimum of $500,000 (however, the Investment Manager reserves the right to permit Participating Entities to acquire Units with less than such minimum investment). The Group Trust will pay all expenses of the organization of the Group Trust and Investment Fund and the sale of Units in the Investment Fund to Participating Entities.

A copy of the Adoption Agreement for purchasing Units is attached as Exhibit B. Each Participating Entity will be required to execute an Adoption Agreement and other documents to be accompanied by payment of the purchase price for the Units being acquired in the Investment Fund.

## The Investment Manager

The Investment Manager is J.P. Jeanneret Associates, Inc., which is currently wholly-owned by Dr. John P. Jeanneret. The Investment Manager, Dr. Jeanneret and/or affiliates of Dr. Jeanneret may acquire Units Offered hereby. IT SHOULD BE NOTED THAT NEITHER THE INVESTMENT MANAGER NOR MR. JEANNERET ENGAGED IN THE BUSINESS OF OPERATING AND ADVISING A GROUP TRUST PRIOR TO THE FORMATION OF THE MASTER INCOME-PLUS GROUP TRUST.

## Determination of Value

The net asset value ("Value") of the Investment Fund will be determined as of the last business day of each calendar quarter (hereinafter individually "Valuation Date"). The Value of the Investment Fund will equal the total value of its assets, including accrued income, minus the total value of its liabilities, including accrued expenses and appropriate reserves. The Value of each Unit will equal the Value of the Investment Fund divided by the number of outstanding Units. Assets of the Investment Fund invested with investment managers in partnerships operated by such investment managers will be valued at the last reported value from each investment manager. Publicly-traded securities will generally be valued by reference to closing market prices on national securities exchanges or generally accepted pricing services selected by the Investment Manager. See Article V of the Trust Agreement annexed hereto as Exhibit A for a complete statement of how Value is determined.

## Fees and Expenses of Investment Fund

The Investment Fund will initially pay (collectively, "Base Fee") (a) Investment Manager a quarter-annual management fee of three-thirty seconds (.09375%) percent, and (b) on behalf of the Investment Manager, the Advisor a quarter-annual advisory fee equal

-16-

to three-thirty seconds (.09375%) percent, of the Investment Fund's Value (as adjusted for additions and withdrawals of funds) at the end of each calendar quarter. A pro rata Base Fee will be charged to Participating Entities on any amount permitted to be withdrawn during any calendar quarter so that the Investment Fund will have paid no more than the Base Fee of .1875% of the Investment Fund's Value at the end of such period, plus a pro rata Base Fee on the funds withdrawn.

In addition, the Investment Fund will pay an additional fee ("Additional Fee") of twenty (20%) percent of the amount by which the increase in Value of the Investment Fund during any calendar year, before deduction of the Additional Fee, exceeds the Priority Return (as defined below) as calculated hereinbelow:

(a) To the extent a Participating Entity does not acquire Units or withdraw funds during a calendar year, the Additional Fee shall be payable on any increase in the Value of the Units of such Participating Entity over the Priority Return from the beginning of the Fiscal Year.

(b) As to any acquisition of Units by a new Participating Entity or any additional Units acquired or any funds withdrawn by a Participating Entity during the calendar year, the increase in the Value of such Units during the portion of the Fiscal Year that the funds were invested shall be annualized.

(c) To the extent a Participating Entity withdraws funds or acquires additional Units during the calendar year, the increase in the Value of such Participating Entity's Units shall be calculated by combining (x) the increase in Value calculated as set forth in subsection (a) above for the portion of funds invested for the entire year, and (y) the increase in Value calculated as set forth in subsection (b) above for funds invested for less than the entire year. The Additional Fee shall be payable to the extent the aggregate of (x) and (y) exceed the Priority Return.

(d) For purposes of calculating the Priority Return for a Participating Entity which acquires Units or withdraws funds during a quarter, and for the first and last calendar year of the Investment Fund, the Priority Return shall be annualized for such Participating Entity on a per diem basis.

Initially, one-half (1/2) of the Additional Fee will be paid by the Investment Fund to the Investment Manager and, on behalf of the Investment Manager, one-half (1/2) of the Additional Fee will be paid to the Advisor.

-17-

The payment of the fees to the Advisor is the sole obligation of the Investment Manager and the Investment Manager has given standing instructions to the Investment Fund to pay one-half (1/2) of all fees earned by the Investment Manager directly to the Advisor. The Advisor has agreed to look solely and exclusively to the Investment Manager for payment of its fees.

The Investment Fund will pay all of its accounting, legal and other operating expenses, including but not limited to, the Trust's tax on unrelated business taxable income.

In addition to the above, the fees charged by Designated Managers may include brokerage commissions, a percentage of assets managed, a percentage of profits, a fixed fee or a combination thereof. Where a Designated Manager's compensation includes a percentage of profits, it may result in substantially higher costs than other compensation arrangements.

Priority Return

The "Priority Return" to Participating Entities shall be calculated annually and shall equal the sum of (a) 10% less (b) the Base Fee. Each Participating Entity will be entitled to receive the Priority Return allocable to the period in which it is invested before any Additional Fee will be charged. During annual periods in which the Investment Fund fails to provide Participating Entities with the Priority Return, the shortfall, the difference between the Priority Return and the actual return to the Participating Entities, will be added to the succeeding years' Priority Returns before any succeeding years' Additional Fees shall be earned.

How to Withdraw

A Participating Entity may cause any or all of its Units to be redeemed by the Investment Fund as of the last business day of June or December of each calendar year (each a "Withdrawal Date") at the Value per Unit thereof as of the close of business in New York on such date upon no less than 45 days prior written notice to the Investment Manager. Requests for withdrawal must be made in writing in the form requested by the Investment Manager. The Investment Manager is authorized to require any Participating Entity to withdraw its interest at any time and for any reason upon notice to the investor.

The amount payable upon any withdrawal, voluntary or mandatory, shall be paid without interest as promptly as reasonably practicable after the Withdrawal Date. Under certain circumstances (including the inability of the Investment Fund to liquidate positions or the default or delay in payments due to the Investment Fund from a Designated Manager, brokers, banks or other persons), the Investment Fund may delay payment to a Participating Entity

-18-

requesting withdrawal of the proportionate part of the Value of the Units being withdrawn which represents sums which are the subject of such default or delay, or the Investment Fund may distribute property in kind as determined by the Investment Manager in payment of a withdrawal of Units.

## INCOME TAX ASPECTS

The following is a general discussion of certain of the anticipated U.S. Federal income tax consequences of an investment in the Investment Fund.  This discussion is based upon laws, regulations, rulings and decisions now in effect, all of which are subject to change or possibly differing interpretations. Prospective Participating Entities should consult their own tax advisors in determining the Federal, state, local and foreign tax consequences to them of an investment in the Investment Fund.

It is intended that the Group Trust qualify as a "group trust" (under applicable Internal Revenue Service ("IRS") rulings and regulations) exempt from taxation under Code Section 501(a). Accordingly, investments may only be made by eligible plans, trusts, IRAs and governmental units as described below under "ELIGIBILITY REQUIREMENTS" which are themselves exempt from Federal income taxation.  So long as the Group Trust qualifies as a group trust, an investment in the Investment Fund should not affect the tax exempt status of eligible Participating Entities.

The Group Trust will be subject to tax on "unrelated business taxable income" (as defined below) in excess of $1,000. "Unrelated business taxable income" is generally defined by Code Section 512(a) to be the excess of gross income from any "unrelated trade or business" (as defined in Code Section 513) conducted by an exempt organization, including income derived from or attributable to certain "debt-financed property" (as defined in Code Section 514(b)), over the allowable deductions attributable to such trade or business and debt-financed property, with certain modifications. These modifications, which are set forth in Code Section 512(b), provide that unrelated business taxable income generally does not include dividends, interest, annuities, royalties and gain or loss from the disposition of property other than stock in trade or property held for sale in the ordinary course of a trade or business, except to the extent such income is derived from or is attributable to "debt-financed property."

Ordinary investment activities undertaken in connection with the management of an exempt organization's securities portfolio may not be considered to be a trade or business activity of the exempt organization.   The income derived from such activities may therefore not be considered to be unrelated business taxable income without regard to whether the income comes within one of the Code Section 512(b) modifications (except to the extent such income is attributable to debt-financed property).  Whether the Group Trust

-19-

may be considered to be carrying on a trade or business (as opposed
to merely conducting ordinary investment activities) is a question
of fact. Applying general tax principles at the Group Trust level,
the Group Trust may not be considered to be engaged in a trade or
business if the objective of the Group Trust is to obtain long-term
capital appreciation (although some of the Group Trusts' investment
practices may be more characteristic of a trader). However, the
IRS has recently taken the position that the term "trade or
business" for purposes of Code Section 512 encompasses any "profit-
motivated" activity.

     The Group Trust may derive income that may be considered to
be unrelated business taxable income in certain cases.   In the
event the Group Trust incurs indebtedness and uses the proceeds
therefrom to acquire investments, such investments will be treated
as debt-financed property and income from such property will be
treated as unrelated business taxable income.   In addition, the
Group Trust may enter into certain forward or futures contracts and
security repurchase agreements, and may engage in other types of
investment practices that generate income that may not strictly be
dividends, interest or gains from the disposition of property
(although such income may be substantially equivalent thereto). It
is unclear currently whether income or gains derived from such
investment practices constitutes unrelated business taxable income.
Certain recent statements and actions by the IRS may indicate that
it intends to treat all of an exempt organization's investment
income as unrelated business taxable income to the extent such
income is not expressly included in a Code Section 512(b)
modification.    The IRS has announced that it is currently
considering whether income and gains from certain investment
practices should be classified as unrelated business taxable
income. No assurances can be given that any such income or gains
derived by the Group Trust from the investment practices referred
to above would not give rise to unrelated business taxable income.

     The Group Trust may invest directly or indirectly in other
investment companies  that for U.S. Federal income tax purposes
will constitute "passive foreign investment companies" or "PFICs".
Generally, the Code defines "PFICs" as foreign corporations which
meet one or both of the following tests:   (a) 75% or more of the
gross income of the corporation is passive income, or (b) 50% or
more of the average value of the corporation's assets consist of
assets that would produce passive income.   U.S. shareholders of
PFICs are subject to special tax rules. In general, unless a U.S.
shareholder of a PFIC makes a qualifying election to include in
gross income its pro rata share of the PFIC's earnings and profits
for the taxable year (which may not be possible in the case of all
PFICs), it will be subject to a deferred tax and interest charge in
respect of so-called "excess distributions" from the PFIC, which
distributions include any gain realized upon the disposition of
shares of the PFIC. Since PFIC excess distributions (including any
gain from the disposition of the shares of a non-qualifying PFIC)

-20-

are taxed as ordinary income, the classification of such excess distributions for unrelated business taxable income purposes is uncertain. While the Internal Revenue Service has indicated in a recent private letter ruling that income from a PFIC that is the subject of a qualifying election would not be classified as unrelated business taxable income, such a ruling is applicable only to the taxpayer to whom it was issued, and the Group Trust in any event may not be able to make a qualifying election with respect to a particular PFIC. Furthermore, even if a Group Trust were to make a qualifying election in respect of a PFIC in which the Group Trust had invested, it is uncertain whether the amount includible in the Group Trust's gross income by reason of such election would constitute income from "debt-financed property" if and to the extent that the PFIC incurred indebtedness for the purpose of acquiring the investment giving rise to such income.

From time to time legislation has been introduced in Congress that would have the effect of treating any income attributable to certain PFICs as unrelated business taxable income. While such legislation has not been adopted, there can be no assurances that such measures will not be enacted in the future.

### ERISA CONSIDERATIONS

The Employee Retirement Income Security Act of 1974, as amended ("ERISA") and the regulations promulgated thereunder by the United States Department of Labor (the "DOL") provide as a general rule that a fiduciary with respect to employee benefit plans ("Plans") subject to ERISA must discharge its responsibilities with respect to a Plan in a prudent manner and must consider several factors in determining whether to enter into an investment or engage in an investment course of action. If a fiduciary with respect to any such Plan breaches its responsibilities with regard to selecting an investment or an investment course of action for such Plan, the fiduciary may be held personally liable for losses incurred by the Plan as a result of such breach. Among the factors that should be considered are the diversification and liquidity of the Plan's portfolio, the potential return on the proposed investment and the place the proposed investment would occupy in the Plan's portfolio taken as a whole.

ERISA imposes certain duties and responsibilities on persons (including investment managers) who are deemed to be fiduciaries (within the meaning of Section 3(21) of ERISA) and prohibits them from entering into transactions involving plan assets with various parties in interest (within the meaning of Section 3(14) of ERISA) with respect to the Plan. Generally, under ERISA, the Plan trustees, named fiduciaries or duly appointed investment managers (within the meaning of Section 3(38) of ERISA) have exclusive authority and discretion to manage and control assets of the Plan. If any such "prohibited transaction" is entered into, certain excise taxes may be payable by the party in interest, and the Plan

fiduciaries may be liable to the Plan for any losses incurred.

The assets of the Group Trust will constitute "plan assets" under regulations promulgated by the DOL. The Investment Manager will therefore be deemed a fiduciary with respect to each investing Plan and the general prudence and fiduciary responsibility provisions of ERISA will be applicable to it and to the operations of the Group Trust. The Investment Manager does not expect that the applicability of these ERISA provisions to the Group Trust will interfere with the operations or the results of the Group Trust in any material way.

Certain prospective Participating Entities may currently maintain relationships with the Investment Manager under which the Investment Manager provides investment advisory and/or management services to the Plan. These relationships may cause the Investment Manager or such affiliates to be deemed to be fiduciaries of those Plans. The DOL has issued regulations defining the term "fiduciary" which provide that an investment advisor who renders investment advice to a Plan for a fee and who either has discretionary control over plan assets or renders advice pursuant to an understanding that such advice will serve as a primary basis for the Plan's investment decisions will be deemed a fiduciary but only with respect to that portion of the Plan's assets with respect to which the investment advisor renders such advice or has such discretion. The prior written authorization of an independent fiduciary of any Plan for which the Investment Manager or one of its affiliates acts as investment advisor or has a preexisting fiduciary relationship shall be obtained before assets of such Plan will be invested in the Group Trust. Further, if the Investment Manager acts as investment advisor to a Plan, it will eliminate its advisory fee charged to the Plan with respect to the amount of such Plan's investment in the Group Trust.

## ELIGIBILITY REQUIREMENTS

The acquisition of Units in the Investment Fund involves a degree of risk. See "RISK FACTORS" P. 11 to P. 14. Further, transfer of the Units is not permitted. Consequently, the Investment Manager has adopted as a general investor suitability standard that each prospective Participating Entity represent in writing that it is an Accredited Investor (as defined below) or a Sophisticated Investor (as defined below). The suitability standards referred to above and itemized below represent minimum suitability requirements for prospective Participating Entities and the satisfaction of such standards by a prospective Participating Entity does not necessarily mean that Units are a suitable investment for such Participating Entity.

This offering is made for purchase of Units only by (i) "Accredited Investors" as defined by Regulation D of the Act, and (ii) up to 35 "Sophisticated Investors", pursuant to an exemption

-22-

from registration under Regulation D as promulgated by the Securities and Exchange Commission and under Section 4(2) of the ~~Securities Act of 1933, as amended.~~

In addition to the other suitability requirements set forth herein, a prospective Participating Entity will only be permitted to acquire Units in the Investment Fund if all of the following conditions are met:

(1) such entity is either (A) a trust that is part of a pension or profit sharing plan of an employer and either (i) such trust is exempt, under Section 501(a) of the Code, from United States income taxation by reason of the plan having qualified under Section 401(a) of the Code or (ii) such trust is a governmental plan described in Sections 401(a)(24) and 818(a)(6) of the Code, or (B) an individual retirement account ("IRA") exempt under Section 408(e).

(2) The Trust Agreement is incorporated by reference into, and the Group Trust is adopted as part of, such plan or IRA.

(3) The Participating Entity has entered into an Adoption Agreement with the Investment Manager providing for the admission of such trust or IRA as a Participating Entity.

(4) The Investment Manager has certified in writing to the Trustee that the foregoing conditions have been satisfied and has directed the Trustee to admit such trust or IRA as a Participating Entity. The Investment Manager shall have sole responsibility for determining that a trust or IRA is eligible to purchase Units of the Investment Fund.

An Accredited Investor, under Regulation D of the Act, includes:

(1) An employee benefit plan within the meaning of ERISA:

(i)   whose investment decision is made by a plan fiduciary, as defined in Section 3(21) of ERISA, which is either a bank, savings and loan association, insurance company or registered investment advisor; or

(ii)  having total assets in excess of $5,000,000; or

(iii) if self-directed, the investment decisions are made solely by persons, that are Accredited Investors.

-23-

(2) An individual retirement account exempt under Section 408(e) of the Code provided that the beneficiary meets one of the following tests:

    (i)    the beneficiary has an individual net worth, or joint net worth with his or her spouse, of at least $1,000,000; or

    (ii)    the beneficiary has individual income in excess of $200,000 in each of the two most recent years or joint income with his or her spouse in excess of $300,000 in each of those years and has a reasonable expectation of reaching the same income level in the current year.

(3) Any plan established and maintained by a state, its political subdivision, or any agency or instrumentality of a state or its political subdivisions, for the benefit of its employees, if such plan has total assets in excess of $5,000,000.

(4) A tax-exempt organization under Section 501(c)(3) of the Internal Revenue Code having total assets in excess of $5,000,000 which was not formed for the specific purpose of acquiring a Unit.

A prospective Participating Entity is a "Sophisticated Investor" if it satisfies the following requirements:

(1) the person or persons making the investment decision (i) has or have prior knowledge and experience in business and financial matters, including investment in restricted securities, enabling such person or persons to evaluate the merits and risks of purchasing a Unit; and (ii) recognize and understand the nature of the investment in the Investment Fund; and

(2) at the time of the purchase of the Units, the prospective Participating Entity has a net worth in excess of $1 million.

Each prospective Participating Entity must complete an Adoption Agreement, which includes representations as to the Participating Entity prior to any purchase of a Unit in order to determine suitability and to determine whether the potential Participating Entity is a qualified Participating Entity.

## SUBSCRIPTION PROCEDURES

In order to purchase Units, an eligible Participating Entity must (1) complete and execute a copy of the Adoption Agreement and Participating Entity Information Statement, (2) deliver the foregoing documents to J.P. Jeanneret Associates, Inc., 100 East Washington Street, Syracuse, New York 13202 at least 15 days before the Valuation Date, and (3) arrange for payment of the full purchase price of the Units being purchased on or before the Valuation Date.  If paying by wire transfer, funds should be wired to the Investment Fund's account as follows:

        Custodial Princeton
        ABA #031233338
        BNF=Trust A/C #113-50170

        OBI=The Master Income-Plus Group Trust Subscription Account

If paying by check, checks should be made payable to "The Master Income-Plus Group Trust".  Each subscription will be deemed received upon receipt of immediately available funds in the Group Trust's account.  All subscriptions, once made, are irrevocable by the subscriber.  The Investment Manager may reject any subscription if the subscriber does not satisfy the eligibility requirements described above, if any subscription would require registration of the Group Trust or Units under any securities law or for any other reason determined by the Investment Manager.

### MISCELLANEOUS

A prospective Participating Entity should review carefully the Trust Agreement governing the Group Trust and the Adoption Agreement (collectively, the "Agreements") attached hereto as Exhibits A and B, respectively.  Certain aspects of the Agreements not described elsewhere in this Memorandum are outlined below.  However, reference is made to the Agreements for complete details of their terms and conditions.

### No Transfer of Units

Units may not be transferred or assigned by a Participating Entity.

### Termination

The Investment Fund may be terminated at any time by the Investment Manager.  Upon the termination of the Investment Fund, its affairs shall be wound up, its liabilities discharged and its remaining assets distributed pro rata to the holders of Units as set forth in the Trust Agreement.

-25-

## Reports and Accounting

The Investment Fund will keep its books on an accrual basis with a calendar fiscal year end.  The financial statements of the Investment Fund shall be audited at least annually at the Investment Fund's expense by independent public accountants to be designated by the Investment Manager.  Each Participating Entity shall be furnished with an annual audited report and quarterly unaudited statements.

## Indemnification of Trustee

The Trustee will not be liable for any loss or liability which the Investment Fund or the Participating Entities may incur, and the Trustee will be indemnified by the Investment Fund against any loss or liability, except in each case for a loss or liability incurred in connection with its willful misconduct or negligence.

10920.16