# Exhibit I

NAME OF OFFEREE ______________________ NO ______________

______________________________________________________________

______________________________________________________________

CONFIDENTIAL PRIVATE PLACEMENT MEMORANDUM

# INCOME-PLUS INVESTMENT FUND

(A Tax-Exempt Investment Fund Established
Pursuant to The Master Income-Plus Group Trust)

---

November 1, 2003

---

INVESTMENT MANAGER
J P. JEANNERET ASSOCIATES, INC.

TRUSTEE:
CUSTODIAL TRUST COMPANY

______________________________________________________________

______________________________________________________________

THIS OFFERING IS NOT A PUBLIC OFFERING. THE SECURITIES OFFERED HEREBY HAVE NOT BEEN REGISTERED OR QUALIFIED WITH, NOR APPROVED BY, THE SECURITIES AND EXCHANGE COMMISSION OR ANY STATE REGULATORY AUTHORITY, NOR HAS SUCH COMMISSION OR ANY REGULATORY AUTHORITY PASSED UPON THE ACCURACY OR ADEQUACY OF THIS MEMORANDUM. THIS MEMORANDUM DOES NOT CONSTITUTE AN OFFER OR SOLICITATION IN ANY JURISDICTION IN WHICH SUCH OFFER OR SOLICITATION IS NOT LAWFUL, OR IN WHICH THE PERSON MAKING SUCH OFFER OR SOLICITATION IS NOT QUALIFIED TO DO SO.

INCOME-PLUS INVESTMENT FUND

CONFIDENTIAL PRIVATE PLACEMENT MEMORANDUM
FOR THE SALE OF UNITS ("UNITS")
FOR A MINIMUM INVESTMENT OF $1,000,000

The Units offered herein are of Income-Plus Investment Fund ("Investment Fund"), which was established on December 15, 1993 pursuant to The Master Income-Plus Group Trust ("Group Trust") The Group Trust is a tax-exempt "Group Trust" under Internal Revenue Service ("Service") Revenue Ruling 81-100  The Investment Fund has been established to pool investment funds to be managed by a number of independent investment managers ("Managers") selected by the Investment Manager (as defined in this Memorandum)  See "*INVESTMENT STRATEGIES*"

THIS IS A PRIVATE PLACEMENT MADE ONLY BY DELIVERY OF A COPY OF THIS MEMORANDUM TO THE OFFEREE WHOSE NAME APPEARS HEREON  THE OFFERING IS MADE ONLY TO OFFEREES THAT ARE (I) PARTICIPATING ENTITIES (AS DEFINED IN THIS MEMORANDUM), AND (II) EITHER ACCREDITED INVESTORS (AS DEFINED IN RULE 501 OF REGULATION D PROMULGATED BY THE SEC UNDER THE 1933 ACT) OR SOPHISTICATED INVESTORS (AS DEFINED IN THIS MEMORANDUM)

PURCHASE OF THESE SECURITIES INVOLVES CERTAIN RISKS   SEE "*RISK FACTORS*"

CONFLICTS OF INTEREST BETWEEN THE INVESTMENT MANAGER AND THE INVESTMENT FUND MAY ARISE IN VARIOUS CIRCUMSTANCES   SEE "*CONFLICTS OF INTEREST*"

THERE IS NO PUBLIC MARKET FOR THE UNITS OFFERED PURSUANT TO THIS CONFIDENTIAL PRIVATE PLACEMENT MEMORANDUM ("MEMORANDUM")    A PARTICIPATING ENTITY (AS DEFINED IN THIS MEMORANDUM) MAY, HOWEVER, WITHDRAW FROM THE INVESTMENT FUND AND RECEIVE PAYMENT FOR THE PARTICIPATING ENTITY'S UNITS AS SPECIFIED IN THE AGREEMENT OF TRUST ESTABLISHING THE MASTER INCOME-PLUS GROUP TRUST (AS AMENDED, THE "GROUP TRUST AGREEMENT"), A COPY OF WHICH IS ANNEXED HERETO AS EXHIBIT "A"

THE SECURITIES AND EXCHANGE COMMISSION ("SEC") HAS NEITHER PASSED UPON THE MERITS OF PARTICIPATING IN THE INVESTMENT FUND OR GROUP TRUST NOR THE ADEQUACY OR ACCURACY OF THIS MEMORANDUM ANY REPRESENTATION TO THE CONTRARY IS A CRIMINAL OFFENSE  IT IS ANTICIPATED THAT THE OFFERING AND SALE OF THE INTERESTS WILL BE EXEMPT FROM REGISTRATION UNDER THE SECURITIES ACT OF 1933, AS AMENDED ("1933 ACT") AND THE VARIOUS STATE SECURITIES LAWS AND THAT NEITHER THE INVESTMENT FUND NOR THE GROUP TRUST WILL BE REGISTERED AS AN INVESTMENT COMPANY UNDER THE INVESTMENT COMPANY ACT OF 1940, AS AMENDED (THE "INVESTMENT COMPANY ACT") PURSUANT TO AN EXEMPTION PROVIDED BY SECTION 3(c)(1) THEREUNDER

NO RULINGS HAVE BEEN SOUGHT FROM THE SERVICE WITH RESPECT TO ANY TAX MATTERS DISCUSSED IN THIS MEMORANDUM, EXCEPT THAT THE INVESTMENT MANAGER HAS RECEIVED A FAVORABLE DETERMINATION LETTER FROM THE SERVICE THAT THE GROUP TRUST IS A "GROUP TRUST" UNDER REVENUE RULING 81-100 PROSPECTIVE PARTICIPATING ENTITIES TO WHICH THIS MEMORANDUM IS DELIVERED

("OFFEREES") ARE CAUTIONED THAT THE VIEWS CONTAINED HEREIN ARE SUBJECT TO MATERIAL QUALIFICATIONS AND SUBJECT TO POSSIBLE CHANGES IN REGULATIONS BY THE SERVICE OR BY CONGRESS IN EXISTING TAX STATUTES OR IN THE INTERPRETATION OF EXISTING STATUTES AND REGULATIONS

OFFEREES ARE NOT TO CONSTRUE THE CONTENTS OF THIS MEMORANDUM AS LEGAL, TAX OR INVESTMENT ADVICE  OFFEREES SHOULD REVIEW THE PROPOSED TRANSACTIONS WITH THEIR OWN COUNSEL, ACCOUNTANT, BUSINESS AND TAX ADVISOR ON WHOSE OPINIONS THEY SHOULD RELY  A REPRESENTATION TO THAT EFFECT IS REQUIRED TO BE MADE BY EACH OFFEREE ACQUIRING UNITS

THE INVESTMENT MANAGER RESERVES THE RIGHT TO REFUSE ANY SUBSCRIPTION ON THE BASIS OF ANY OFFEREE'S FAILURE TO MEET THE SUITABILITY CRITERIA DESCRIBED HEREIN OR FOR ANY OTHER REASON  EACH OFFEREE WILL BE REQUIRED TO REPRESENT THAT THE OFFEREE IS ACQUIRING THE UNITS FOR THE OFFEREE'S OWN ACCOUNT, FOR INVESTMENT PURPOSES ONLY, AND NOT WITH ANY INTENTION OF DISTRIBUTION, RESALE OR TRANSFER OF THE UNITS, EITHER IN WHOLE OR IN PART, AND NO DISTRIBUTION, RESALE OR TRANSFER OF THE UNITS WILL BE PERMITTED EXCEPT IN ACCORDANCE WITH THE PROVISIONS OF THE 1933 ACT, THE RULES AND REGULATIONS THEREUNDER, ANY APPLICABLE STATE SECURITIES LAWS AND THE TERMS AND CONDITIONS OF THE GROUP TRUST AGREEMENT  FURTHER, EACH OFFEREE MUST REPRESENT AND WARRANT THAT THE OFFEREE HAS READ THIS MEMORANDUM AND IS AWARE OF AND CAN AFFORD THE RISKS OF AN INVESTMENT IN THE INVESTMENT FUND FOR AN INDEFINITE PERIOD OF TIME  THIS INVESTMENT IS SUITABLE ONLY FOR OFFEREES WHO HAVE ADEQUATE MEANS OF PROVIDING FOR THEIR CURRENT AND FUTURE NEEDS AND CONTINGENCIES, AND HAVE NO NEED FOR LIQUIDITY IN THIS INVESTMENT  SEE *"SUITABILITY REQUIREMENTS"*

NO OFFERING LITERATURE OR ADVERTISING IN WHATEVER FORM SHALL BE EMPLOYED IN THE OFFERING OF UNITS EXCEPT FOR THIS MEMORANDUM

EACH OFFEREE AND REPRESENTATIVE(S) OF OFFEREES, IF ANY, ARE INVITED TO ASK QUESTIONS AND OBTAIN ADDITIONAL INFORMATION FROM THE INVESTMENT MANAGER CONCERNING THE TERMS AND CONDITIONS OF THE OFFERING, THE INVESTMENT FUND, THE GROUP TRUST, AND ANY OTHER RELEVANT MATTERS (INCLUDING BUT NOT LIMITED TO, ADDITIONAL INFORMATION TO VERIFY THE ACCURACY OF THE INFORMATION SET FORTH HEREIN) TO THE EXTENT THE INVESTMENT MANAGER POSSESSES SUCH INFORMATION OR CAN ACQUIRE IT WITHOUT UNREASONABLE EFFORT OR EXPENSE  OFFEREES OR THEIR REPRESENTATIVES HAVING QUESTIONS OR DESIRING ADDITIONAL INFORMATION SHOULD CONTACT J P JEANNERET ASSOCIATES, INC , 100 EAST WASHINGTON STREET, SYRACUSE, NEW YORK 13202, TELEPHONE NO (315) 478-2770 AND FACSIMILE NO (315) 478-3043

THIS MEMORANDUM CONTAINS SUMMARIES, BELIEVED BY THE INVESTMENT MANAGER TO BE ACCURATE, OF CERTAIN TERMS OF CERTAIN DOCUMENTS, BUT REFERENCE IS HEREBY MADE TO THE ACTUAL DOCUMENTS (COPIES OF WHICH ARE ATTACHED HERETO OR ARE AVAILABLE FROM THE INVESTMENT MANAGER) FOR COMPLETE INFORMATION CONCERNING THE RIGHTS AND OBLIGATIONS OF THE PARTIES THERETO, AND ALL SUCH SUMMARIES ARE QUALIFIED IN THEIR ENTIRETY BY THIS REFERENCE  ALL DOCUMENTS RELATING TO THIS PRIVATE PLACEMENT WILL BE MADE AVAILABLE TO THE OFFEREE AND THE OFFEREE'S REPRESENTATIVES UPON REQUEST  NO PERSON HAS BEEN AUTHORIZED TO MAKE ANY REPRESENTATIONS OR FURNISH ANY INFORMATION WITH RESPECT TO THE INVESTMENT FUND, THE GROUP TRUST OR THE UNITS OTHER THAN THE REPRESENTATIONS AND INFORMATION SET

FORTH IN THIS MEMORANDUM OR OTHER DOCUMENTS OR INFORMATION FURNISHED BY THE INVESTMENT MANAGER UPON REQUEST, AS DESCRIBED ABOVE

THE INFORMATION CONTAINED HEREIN IS GIVEN AS OF THE DATE HEREOF AND THIS MEMORANDUM DOES NOT PURPORT TO GIVE INFORMATION AS OF ANY OTHER DATE    NEITHER THE DELIVERY OF THIS MEMORANDUM NOR ANY SALES MADE HEREUNDER SHALL, UNDER ANY CIRCUMSTANCES, CREATE AN IMPLICATION THAT THERE HAS BEEN NO CHANGE IN THE MATTERS DISCUSSED HEREIN SINCE THE DATE HEREOF

THIS MEMORANDUM IS SUBMITTED IN CONNECTION WITH THE PRIVATE PLACEMENT OF UNITS AND MAY NOT BE REPRODUCED OR USED FOR ANY OTHER PURPOSE    ANY DISTRIBUTION OF THIS MEMORANDUM IN WHOLE OR IN PART, OR THE DIVULGENCE OF ANY OF ITS CONTENTS, IS UNAUTHORIZED    THE OFFEREE, BY ACCEPTING DELIVERY OF THIS MEMORANDUM, AGREES TO RETURN THIS MEMORANDUM AND ALL ENCLOSED DOCUMENTS TO THE INVESTMENT MANAGER IF THE OFFEREE DOES NOT PURCHASE ANY UNITS

**FOR RESIDENTS OF ALL STATES**

IN MAKING AN INVESTMENT DECISION, INVESTORS MUST RELY ON THEIR OWN EXAMINATION OF THE ISSUER AND THE TERMS OF THE OFFERING, INCLUDING THE MERITS AND RISKS INVOLVED    THESE SECURITIES HAVE NOT BEEN RECOMMENDED BY ANY FEDERAL OR STATE SECURITIES COMMISSION OR REGULATORY AUTHORITY FURTHERMORE, THE FOREGOING AUTHORITIES HAVE NOT CONFIRMED THE ACCURACY OR DETERMINED THE ADEQUACY OF THIS DOCUMENT    ANY REPRESENTATION TO THE CONTRARY IS A CRIMINAL OFFENSE

THESE SECURITIES ARE SUBJECT TO RESTRICTIONS ON TRANSFERABILITY AND RESALE AND MAY NOT BE TRANSFERRED OR RESOLD EXCEPT AS PERMITTED UNDER THE 1933 ACT AND THE APPLICABLE STATE SECURITIES LAWS, PURSUANT TO REGISTRATION OR EXEMPTION THEREFROM    INVESTORS SHOULD BE AWARE THAT THEY WILL BE REQUIRED TO BEAR THE FINANCIAL RISKS OF THIS INVESTMENT FOR AN INDEFINITE PERIOD OF TIME

**TABLE OF CONTENTS**

| CAPTION | PAGE |
|---|---|
| SUMMARY OF THE OFFERING | A |
| INTRODUCTION | 1 |
| INVESTMENT STRATEGIES | 4 |
| MANAGEMENT OF THE INVESTMENT FUND | 9 |
| RISK FACTORS | 11 |
| FINANCIAL SUMMARY OF THE OFFERING | 15 |
| CONFLICTS OF INTEREST | 17 |
| INCOME TAX ASPECTS | 18 |
| ERISA CONSIDERATIONS | 20 |
| SUITABILITY REQUIREMENTS | 21 |
| SUBSCRIPTION PROCEDURES | 23 |

**EXHIBITS**

"A" Agreement of Trust Establishing Group Trust, as amended

"B" Adoption Agreement

"C" Declaration Establishing Income-Plus Investment Fund Under Group Trust

## SUMMARY OF THE OFFERING

The following is only a summary of the information contained in this Memorandum and is qualified in its entirety by other information contained in this Memorandum and by the Group Trust Agreement and Adoption Agreement Offerees should read the entire Memorandum, Group Trust Agreement and Adoption Agreement carefully before making any investment decision regarding the Investment Fund and should pay particular attention to the information under the headings "*RISK FACTORS*" and "*CONFLICTS OF INTEREST*" In addition, Offerees should consult their own advisors in order to potentially increase their understanding of this investment

**The Investment Fund** The Income-Plus Investment Fund ("Investment Fund") was created on December 15, 1993 as an investment entity of "The Master Income-Plus Group Trust", a tax-exempt "Group Trust" under Internal Revenue Ruling 81-100 The purpose of the Investment Fund is to pool investment assets of certain qualified pension plans and other qualified entities (see "*Eligibility*" below) to be managed by a number of Managers selected by the Investment Manager that utilize hedging and arbitrage strategies See "INVESTMENT STRATEGIES" The Investment Fund was designed to offer investors the benefits that result from the management of a large pool of assets, such as diversification, economies, and access to managers and strategies that, otherwise, would not be available

**Investment Objective** The Investment Funds objective is to seek consistent-returns substantially higher than the risk-free rate of return (i e , Treasury Bills), while attempting to minimize risk (i e , return volatility) **There can be no assurance that the Investment Fund will achieve its objective.** It is the intention of the Investment Manager to allocate assets of the Investment Fund such that they are reasonably diversified with regard to both Managers and hedging and arbitrage strategies See "*INVESTMENT STRATEGIES*" Such diversification minimizes the potential adverse risk that a single Manager or strategy may have relative to the total return of the Investment Fund In addition, all Managers will be subject to initial and ongoing due diligence with regard to their business and investment strategy implementation and results

**Investment Manager** J P Jeanneret Associates, Inc , a New York corporation organized in 1988, has been the investment manager of the Investment Fund since the inception of the Investment Fund The Investment Manager is a registered investment adviser under the Advisers Act The Investment Manager is the "investment manager" for the Group Trust and Investment Fund within the meaning of Section 3(38) of the Employee Retirement Income Security Act of 1974, as amended ("ERISA") The Investment Manager is also a Qualified Professional Asset Manager ("QPAM") The Investment Manager has sole and complete authority to manage the Investment Fund's assets See "*MANAGEMENT OF THE INVESTMENT FUND – The Investment Manager*"

**Advisor** The Investment Manager has retained Ivy Asset Management Corp , a wholly owned subsidiary of The Bank of New York Company, Inc ("Advisor"), to consult with regarding the identification of potential Managers, due diligence, Manager selection, portfolio allocation and re-balancing, and to provide certain administrative, back-office and other general support services See *MANAGEMENT OF THE INVESTMENT FUND – The Advisor*"

**Trustee**

Custodial Trust Company ("Trustee") is an FDIC insured New Jersey bank based in Princeton, New Jersey The Trustee commenced operations in 1985 and holds in excess of $94 billion in unaffiliated and affiliated customer assets The Trustee's customers include public and private pension funds, mutual funds, banks and insurance companies The Trustee's business focus is purely institutional See "*MANAGEMENT OF THE INVESTMENT FUND – The Trustee*"

**Eligibility**

Units may be purchased only by (herein referred to individually as a "Participating Entity" and collectively as "Participating Entities") an entity that is (1) a pension or profit sharing trust which by qualifying under the Internal Revenue Code of 1986, as amended (the "Code") Section 401(a) is exempt from taxation under Code Section 501(a), (2) a plan or governmental unit described in Code Sections 401(a)(24) and 818(a)(6), or (3) an individual retirement account exempt under Code Section 408(e) In addition, Units may only be purchased by Participating Entities which qualify as either Accredited Investors or Sophisticated Investors, provided that Units have not been and will not be sold to more than 35 Sophisticated Investors (calculated as the aggregate number of Sophisticated Investors that have purchased Units as of the date the Investment Fund commenced operations) See "*SUITABILITY REQUIREMENTS*" The Investment Manager may, in its sole discretion, reject any subscription for any reason

**Minimum Investment and Admission of Participating Entities**

The Investment Fund is offering an unlimited number of Units, each Unit to be sold at its Unit Net Asset Value (as defined in this Memorandum) on the relevant Valuation Date (as defined in this Memorandum) The required minimum aggregate subscription for Units is $1,000,000 (although the Investment Manager has discretion to accept lesser amounts) Both whole and fractional Units will be sold The Investment Manager expects that additional Participating Entities will be admitted, and additional subscriptions from existing Participating Entities will be accepted, throughout the term of the Investment Fund Subscriptions generally will be accepted as of the first Business Day (as defined in this Memorandum) of each calendar quarter and at such other times as determined by the Investment Manager (each such date being an "Opening Date") The purchase price (the "Offering Price") for a Unit on an Opening Date will be the Unit Net Asset Value on the immediately preceding Valuation Date There is no minimum or maximum aggregate amount of funds which may be invested in the Investment Fund The term "Business Day" means any day on which securities are traded on the New York Stock Exchange

**Withdrawal**

Unless otherwise determined by the Investment Manager in its sole and absolute discretion (which determination can be made on a Participating Entity basis), withdrawal of Units by a Participating Entity may be made as of the close of business in New York on the last Business Day of March, June, September and December of each calendar year (each a "Withdrawal Date") upon at least 60 days prior written notice to the Investment Manager and at the Value per Unit on the Withdrawal Date, less the Management Fee

The Investment Manager is authorized to require any Participating Entity to withdraw all or any of its Units at any time and for any reason upon notice to the Participating Entity All withdrawals will be paid as promptly as

reasonably practicable after the Withdrawal Date, subject to the Investment Manager's right to defer payment in certain limited circumstances See "*FINANCIAL SUMMARY OF THE OFFERING*"

**Management Fee**

The Investment Manager shall receive a quarterly management fee (the "Management Fee") equal to 0 3125% of the Investment Fund Net Asset Value (as defined in this Memorandum) at the end of each calendar quarter The Management Fee will be calculated and accrued monthly and paid quarterly in arrears (calculated, however, without reduction for the Management Fee attributable to such calendar quarter) A pro rata Management Fee will be charged on any amounts permitted to be invested and redeemed during any calendar quarter See "*FINANCIAL SUMMARY OF THE OFFERING - Management Fee*"

**Expenses**

The Investment Fund will pay the fees and expenses of the Custodial Trust Company (the "Trustee"), legal, auditing, accounting and all other operating and administrative expenses, including tax on unrelated business taxable income ("UBTI"), if any, and expenses incurred in connection with the offer and sale of units of the Investment Fund See "*FINANCIAL SUMMARY OF THE OFFERING - Expenses*"

**Distributions**

The Investment Fund currently does not expect to make any distributions to the Participating Entities, except pursuant to requests for withdrawal and upon termination of the Investment Fund Investment Fund income and gains are automatically reinvested

**Assignment and Transfer of Units**

Units are not assignable or transferrable There is and will be no public or private market (primary or secondary) for the Units

**Certain Federal Income Tax Aspects**

The Group Trust is intended to meet the requirements of an exempt group trust within the meaning of Revenue Ruling 81-100, IRB 1981-13, in which event the Investment Fund will not be subject to Federal income taxation and an eligible Participating Entity's tax-exempt status will not be affected by its investment in the Investment Fund See "*INCOME TAX ASPECTS*"

**Risks**

An investment in the Investment Fund involves various risks See "*RISK FACTORS*"

**Reports to Participating Entities**

Each Participating Entity will receive (i) annual audited financial statements and tax information as may be required, and (ii) unaudited quarterly financial statements (other than the quarter ending December 31)

**Auditor**

Margolin, Winer & Evens LLP

**Attorneys**

Bryan Cave LLP

**How to Subscribe**

Offerees interested in acquiring Units are required to complete and execute the Adoption Agreement and the Participating Entity Information Statement and return such documents to the Investment Manager at least fifteen (15) days prior to the relevant Opening Date Under the terms of the Adoption

Agreement an Offeree must pay 100% of the Offeree's subscription on or prior to the relevant Opening Date by wire transfer of immediately available funds, or by check, subject to collection, payable to "The Master Income-Plus Group Trust", in accordance with the instructions set forth in this Memorandum in the section entitled "*SUBSCRIPTION PROCEDURES*"

INTRODUCTION

Income-Plus Investment Fund, a tax-exempt fund ("Investment Fund"), has been formed by the Investment Manager (as defined in this Memorandum) to pool certain of the assets of certain qualifying employee pension and profit sharing plans or certain other entities, including exempt individual retirement accounts, all of which are either Accredited Investors or Sophisticated Investors (collectively "Participating Entities") for investment purposes only The Investment Fund was established on December 15, 1993 pursuant to The Master Income-Plus Group Trust ("Group Trust") The Group Trust was formed on February 23, 1993 pursuant to an Agreement of Trust-Establishing The Master Income Plus Group Trust, as amended by the First Amendment to Agreement of Trust Establishing the Master Income-Plus Group Trust dated as of November 1, 2003 ("Group Trust Agreement") between the Trustee and the Investment Manager The Trust Agreement provides that the Investment Manager may establish additional investment funds by executing and delivering to the Trustee a Declaration Establishing Investment Fund under the Group Trust ("Declaration") The Investment Fund is a group trust fund established by the Investment Manager pursuant to such a Declaration The Investment Manager reserves the right, in its sole and absolute discretion, to convert, at any time, the Investment Fund into a "master-feeder" structure

The Investment Manager, together with the Advisor (as defined in this Memorandum), have identified a number of hedging and arbitrage strategies utilized by Managers with whom the Investment Manager intends to invest substantially all of the assets of the Investment Fund These Managers, either through directly-managed accounts or through their own investment limited partnership, limited liability company or corporation within which the Investment Fund would participate, employ varying investment styles and strategies Such styles and strategies include absolute return/market neutral, long-short equity, event driven/special situations, and other multiple strategies Future investments may also be made with Managers employing other hedging and arbitrage strategies involving stocks, bonds, options on stocks and other financial instruments While it is anticipated that a substantial portion of the assets of the Investment Fund will be invested with Managers recommended to the Investment Manager by the Advisor, all decisions regarding the investment, maintenance and withdrawal of Investment Fund assets will be made by the Investment Manager in its sole and absolute discretion In addition, the Investment Manager may directly manage up to ten (10%) percent of the assets of the Investment Fund

The Investment Fund's objective is to seek consistent returns substantially higher than the risk-free rate of return (i e Treasury Bills) while attempting to minimize risk (i e return volatility) **There can be no assurance that the Investment Fund will achieve its objective.** It is the intention of the Investment Manager to allocate assets within the Investment Fund such that they are reasonably diversified among different Managers and investment strategies, in order to minimize the risk of one strategy adversely affecting the overall investment return However, hedging and arbitrage strategies are generally not intended to profit by taking "market risk" The Investment Manager believes that the objective of consistent capital growth can be achieved with diversified asset management utilizing hedging and arbitrage strategies and employing managers utilizing the same or varied strategies that seek to profit from pricing inefficiencies

The Investment Manager has determined that there are various hedging and arbitrage managers available to clients with high net worth, or managers which require large minimum accounts under management or large investments in the investment vehicles they control, which are not available to some pension and profit sharing plans and individual retirement accounts Also the Investment Manager recognizes the benefits of diversification of assets of such entities among several hedging managers and the economies that can be realized from management of a large pool of assets in the Investment Fund The Investment Manager believes that satisfactory rates of return can be achieved on a consistent basis through various hedging and arbitrage strategies, which have been thoroughly researched by the Investment Manager and its Advisor, Ivy Asset Management Corp As such the Investment Manager believes that the Investment Fund represents a vehicle for achievement of relatively consistent higher

rates of return on pension and profit sharing plans and individual retirement accounts from year to year than the risk-free rate of return (i e Treasury Bills)

J P Jeanneret Associates, Inc , with an address at 100 East Washington Street, Syracuse, New York 13202, is the investment manager ("Investment Manager") The Investment Manager (and its predecessor) has been registered as an investment advisor under the Investment Advisers Act of 1940, as amended ("Advisers Act") since 1974 and is the "investment manager" for the Group Trust and Investment Fund within the meaning of Section 3(38) of the Employee Retirement Income Security Act of 1974, as amended ( ERISA ) The Investment Manager is also a Qualified Professional Asset Manager ("QPAM") The Investment Manager provides investment advice with respect to over $500 million in assets Dr John P Jeanneret and Paul L Perry are the sole shareholders of the Investment Manager Dr Jeanneret serves as its chief executive officer and, together with Paul L Perry, is a director of the Investment Manager

The Investment Fund is offering Units in a private placement pursuant to Section 4(2) of the 1933 Act and Rule 506 of Regulation D promulgated thereunder by the SEC The Units will be sold by the Investment Manager and will be continuously offered in the sole discretion of the Investment Manager No selling commission will be charged The initial subscription by any Offerce is $1,000,000, however, the Investment Manager may, in its sole discretion, waive the foregoing minimum purchase requirement There are no minimum or maximum amounts that may be invested by all of the Participating Entities in the Investment Fund, in the aggregate Existing Participating Entities may subscribe for additional Units of any amount and prospective Participating Entities will be required to purchase at least $1 000 000 of Units, however, the acceptance of any additional or new subscription is at the sole discretion of the Investment Manager Units may be purchased only by Offerees that are (1) a pension or profit sharing trust which by qualifying under Code Section 401(a) is exempt from taxation under Code Section 501(a), (2) a plan or governmental unit described in Code Sections 401(a)(24) and 818(a)(6), or (3) an individual retirement account exempt under Code Section 408(e) In addition, Units may only be purchased by Participating Entities which qualify as either Accredited Investors or Sophisticated Investors, provided that Units have not been and will not be sold to more than 35 Sophisticated Investors (calculated as the aggregate number of Sophisticated Investors that have purchased Units as of the date the Investment Fund commenced operations) See "*SUITABILITY REQUIREMENTS*" The Investment Manager may, in its sole discretion, reject any subscription for any reason

The Investment Fund's fiscal year ends December 31 After the end of each fiscal year, audited financial statements for the year ("Audited Financial Statements") will be prepared by the Investment Fund, audited by the Investment Fund's independent certified public accountants, and will be distributed to each Participating Entity The Participating Entities will also receive unaudited quarterly financial statements ("Unaudited Quarterly Statements") from the Investment Fund after the end of each calendar quarter (other than the calendar quarter ending December 31) indicating the Investment Fund Net Asset Value

Neither the Investment Fund nor the Group Trust is registered as an investment company and neither is subject to the provisions of the Investment Company Act, in reliance upon an exemption for an entity which does not have more than one hundred (100) beneficial owners of its securities Accordingly, the Investment Fund will limit the number of purchasers of Units

The Investment Manager has engaged Ivy Asset Management Corp , a wholly-owned subsidiary of the Bank of New York Company, Inc (the "Advisor"), to consult with the Investment Manager in selecting and monitoring the Managers and to provide certain administrative, back-office and other general support The engagement agreement between the Investment Manager and the Advisor runs to December 31 2005 on which date it is automatically renewable thereafter on a year to year basis unless

cancelled by either party on at least 90 days written notice, during 2005, the final year of the engagement, or during any subsequent calendar year if applicable

Under the engagement agreement, the Advisor has agreed, with respect to the Investment Manager's management of the assets of the Investment Fund, to (i) research, evaluate and meet with potential investment managers of the assets of the Investment Fund, (ii) make recommendations to the Investment Manager that it invest assets of the Investment Fund with certain investment managers by investing in investment vehicles operated by such investment managers and/or by opening up directly-managed accounts with such investment managers, and (iii) monitor, evaluate and assess performance of investment managers that are managing assets of the Investment Fund and to make periodic recommendations to Investment Manager with respect to such performance All advice provided by the Advisor shall be made solely to Investment Manager and all decisions regarding assets of the Investment Fund are made by the Investment Manager in its sole and absolute discretion

The Advisor is registered as an investment adviser under the Advisers Act The Advisor is also registered as a commodity pool operator ("CPO") and as a commodity trading advisor ( CTA ) pursuant to the Commodity Exchange Act As of March 1, 2003 the Advisor managed in excess of $6 2 billion of investor capital

The Bank of New York Company, Inc , a financial holding company ("BNYCo"), is the sole owner of the Advisor The Bank of New York is the world's largest custodian bank with $7 8 trillion in assets under custody as of June 30, 2003

The Trustee is an FDIC-insured commercial bank located in Princeton, New Jersey, and is wholly-owned by The Bear Stearns Companies Inc The Trustee commenced operations in September 1985 The Trustee holds, as custodian or trustee, over $94 billion of assets for institutional clients and affiliated entities The Trustee's customers include public and private pension funds, mutual funds, endowments and insurance companies The Trustee has over $140 million of capital

## INVESTMENT STRATEGIES

The Investment Fund seeks consistent returns substantially higher than the risk-free rate of return (i e , Treasury Bills) while attempting to minimize risk (i e , return volatility) **There can be no assurance that the Investment Fund will achieve its objective.**

The Investment Manager and the Advisor have and will continue to research, select and monitor the Managers that employ the varying strategies and techniques described below The Investment Manager and the Advisor begin the selection process by identifying Managers which have achieved above-average returns through different market cycles Good performance in adverse markets is given greater weight than good performance in favorable markets Consistency of performance is an important factor The Investment Manager and the Advisor reduce the list of prime candidates to those within the specified investment strategies which have performed well The Investment Manager and the Advisor engage in further investigation in order to validate the results shown and where possible to judge the Managers' adherence to their stated strategies The Investment Manager and the Advisor take into account the quality of the Managers, their expertise and experience, their risk posture, as well as measuring their communications and reporting The allocation of Investment Fund assets by the Investment Manager is intended to minimize overall Investment Fund risk while maximizing the ability to achieve profits Neither debt nor margin is employed by the Investment Fund However, individual Managers may employ debt or other leverage The Investment Manager does not intend to engage Managers which invest in commodities, futures on commodities, currencies or speculative investments, except where certain Managers engage in such investments for hedging purposes

The Investment Fund's Managers, whether through limited partnerships, limited liability companies or corporations in which the Investment Fund invests or in connection with directly managed accounts, have complete discretion to purchase and sell securities for the respective partnership, limited liability company, corporation or managed account, subject to any limitations set forth in the respective limited partnership, limited liability company, corporate or managed account agreements All assets of the Investment Fund including, but not limited to, the limited partnership interests the Investment Fund acquires in investment limited partnerships, the membership interests the Investment Fund acquires in limited liability companies, the shares of common stock the Investment Fund acquires in investment corporations and each managed account, are in the name of the Investment Fund

The Investment Manager, in order to balance risk and reward, and taking into account the status of the Participating Entities, has established a number of general policies First is the employment of strategies that meet the objectives of the Investment Fund Generally, such strategies include absolute return/market neutral, long-short equity, event driven/special situations, and other multiple strategies The Investment Manager has and will invest with those Managers who, within each strategy, have the greatest likelihood of achieving anticipated returns The Investment Manager will assess the overall risk of all of the investments it makes by examining the individual risks and the cross-correlation of risks among each of those Managers

Market Neutral and other absolute value return strategies attempt to profit from pricing inefficiencies in various markets, including stocks and bonds, domestic and overseas The investment manager's goal is to profit without taking directional market risk This is generally accomplished by purchasing an undervalued security, or selling short an overvalued security, which is hedged through an offsetting position in a security that has opposite characteristics Therefore, profitability is not dependent upon the rise in price of markets or specific securities, but, instead, through the change in the relationship of the two (2) securities

In classic arbitrage, profits are made from the simultaneous trading of the same instrument in different markets The hedging and arbitrage strategies employed by the investment manager are more complex, involving instruments that have inherent relationships to one another The

investment manager will take advantage of the market's mispricing of related issues, purchasing the undervalued while selling the overvalued

The Managers with whom Investment Fund assets have and will be invested, may be engaged in several different types of Market Neutral strategies, including the following

A <u>Convertible Hedging</u> Convertible hedging involves the simultaneous purchase and short sale of issues of the same corporation The investment manager purchases the undervalued issue and sells short the overvalued issue Often, the hedge involves the purchase of a convertible bond issued by a corporation and the short sale of that corporation s common stock The convertible bond generally has a higher rate of return, carries the corporation's legal obligation to redeem at a pre-determined future date, and places its owner in a higher legal standing, as creditor, than the shareholders, should problems arise with the corporation Therefore, the convertible bond should retain a larger percentage of its value than the common stock when share prices are falling, while retaining the ability to increase in value as the common stock price rises toward, and above, the conversion price The investment manager would purchase the bond when its "premium", the excess of its price over the conversion value, is relatively low If the common stock price were to decline, it would likely fall at a greater percentage than the bond If the common stock price were to rise, the price of the convertible bond would likely increase as well Since there is a difference in amplitude between the relative increases in price, hedges are generally established at less than one hundred (100%) percent

Convertible hedging activities may involve convertible bonds convertible preferred stock, warrants and rights In many instances, options on stocks, including puts and calls, may be utilized

Among the risks involved are credit deterioration of the bond purchased in convertible bond hedging The corporation issuing the bond may become insolvent and no longer able to pay interest, and may place the maturity value of the bond in jeopardy A premium is generally paid to purchase the convertible bond, and it may disappear due to forced conversion of the bond due to a call of the bond by the issuer, or due to a takeover that accelerates the maturity of the bond Interest rate risk also exists, wherein rising interest rates reduce the value of the stream of payments to be received from the fixed income instrument Since Managers may engage in short selling, they must be able to borrow the shares needed to deliver the necessary stock

B <u>Basis and Spread Trading</u> Basis and spread trading attempts to take advantage of mispricing between related securities Basis trading involves assessing the difference between the futures and the cash market for a specific commodity, financial or stock market index Spread trading can involve regulated futures, where the pricing of different months is out of alignment It can also involve options, including puts and calls for differing strike prices and differing months The investment manager will purchase the relatively undervalued side of the spread and simultaneously sell short the relatively overvalued side The investment manager will close both positions when much, if not all, of the pricing discrepancy disappears

As part of the investment manager's calculations, the investment manager will determine the probable profit and loss given various scenarios These will include an extreme rise and/or fall in the price of the underlying stock or commodity The investment manager will establish a hedge that nullifies, as much as possible, the risk of loss due to price changes The goal is capturing the price discrepancy over time

Spread trading may also involve the use of stock index options and futures and a "market basket" of securities The market basket is created to replicate, as nearly as possible, the underlying stocks which are used to calculate the stock index When the futures are underpriced, trading at a discount to their calculated value, they will be purchased while the market basket will

be sold short When the futures are overpriced, they will be sold while the market basket is purchased The goal is capturing the differential in pricing

Basis trading involves the use of financial futures and seeks to capture the yield discrepancies between futures of Treasury Bills, Treasury Bonds and Government-backed mortgages, and their respective actual instruments Where a high return is indicated by the mispricing of a futures contract, the investment manager will simultaneously take an opposite position regarding the deliverable security The investment manager will arrange for any financing that is required, and expect that over time the discrepancy will be captured as profit

Among the risks involved in spread trading are liquidity and execution Liquidity risk arises in spread trading particularly where the instruments utilized are thinly traded An imbalance of sellers and a lack of buyers would force the price of such instruments to low levels, even below what the investment manager deems to be "fair" value See "*RISK FACTORS-Market Risks-Liquidity*" Execution risk occurs when only one side of the paired transaction is executed The investment manager may not be able to complete the other side and therefore would fail to "lock in" the favorable spread

Spread trading does not entail "convergence" in that the instruments involved need not move to the exact same price Since spread trading involves related issues, there is the risk that the relationship spread widens instead of narrowing, and the spread trader may choose, or be required, to abandon the trade at a loss There is also tracking risk, wherein the related securities do not properly correlate After establishing trades involving other parties there may also be counterparty risk, the risk that one of the parties to the transaction may fail to deliver on its obligation

C <u>Conversions and Reversals</u> Conversions involve the purchase of a stock hedged by a combination of a call and a put which is the equivalent of the short sale of that stock Reverse conversions involve the short sale of a stock hedged by a combination of a call and a put which is the equivalent of the purchase of that stock Profit from conversions and reverse conversions is based upon the price discrepancies between the put, call and common stock In addition, profit is enhanced by the difference between the potential return and the current rate of interest By purchasing stock, and hedging with options, the hedger is lending money and expecting to make more money on the loan than the cost of the conversion By selling stock, the hedger becomes a borrower and expects to earn more money on the reverse conversion than he will be charged

D <u>Long/Short Equities Trading</u> Long/short equities trading may involve the purchase of relatively undervalued equities offset by the short sale of relatively overvalued equities One form of such trading involves different classes of a company's stock These include voting and non-voting stock of the same company, which generally have a historical pricing relationship, and a high covariance, with each other Another form of such trading includes the purchase of a company's stock in "local" or "foreign" shares, offset by a short sale of the other The investment manager attempts to take advantage of a misalignment of the historical pricing relationship between these securities

Another form of long/short equities trading may involve the purchase of securities within a particular industry and the short sale of securities within that same industry The investment manager attempts to reduce the industry risk, and, therefore, much of the market risk of general price movements The investment manager's analysis is based on the merits of each individual security, purchasing one the investment manager deems undervalued, while selling short one the investment manager deems overvalued

Long/short equities trading also includes the purchase of a basket of securities deemed undervalued, while concurrently selling short a basket of securities deemed overvalued The investment manager attempts to create two baskets of securities that have common characteristics in order to reduce general market and other exogenous risks The investment manager's long securities tend, however, to have superior characteristics, while the investment manager's short securities tend to have what the investment manager deems to be inferior characteristics Profits are derived from individual stock selection, and the rebate of interest received on short sale proceeds, while market risk is reduced

Among the risks involved in long/short equities trading is tracking risk, wherein the related securities do not properly correlate Also, since the securities held long may have differing characteristics than those sold short, there is the risk that events may impact one side more than the other Where the investment manager is short stock, there is the risk that the stock is "bought in"

E Special Situations Investing Special Situations Investing involves the purchase or sale of securities of companies undergoing a significant change This change may consist of new management, new technology, or new corporate structure Special Situations may also involve companies that are divesting themselves of divisions (spin-offs), acquiring other companies, the object of an acquisition, undergoing a restructuring under bankruptcy, or are involved in other extraordinary events One type of event-driven investing is risk, or merger, arbitrage Merger Arbitrage involves the taking of a position in a security subject to an acquisition, an exchange offer, tender offer, reorganization or liquidation The investment manager must weigh the relevant factors in order to determine the probability that the transaction will be consummated Factors that are involved include shareholder approval, permission of government authorities, possibility of litigation and the target company's willingness to accept or defend against the terms offered

The investment manager profits from the "spread" between the current market price and the amount to be realized If the investment manager purchases the target company's shares, which are to be exchanged for shares of the acquiring company, the investment manager may offset the purchase with a short sale of an equivalent number of shares of the acquiring company's stock to eliminate the "market risk" while the risk of the "deal" remains Success is largely dependent upon the ability to judge correctly the outcome of the proposed transaction

Among the risks involved in Merger Arbitrage investing are systematic (general market) risk and deal-specific risk Systematic risk applies to the general movement of the broad stock market Under most circumstances, the largest determinant of a stock portfolio's return will be its net exposure to the market Deal-specific risk relates to the risk that the deal (merger, etc ) will not be consummated

Many mergers include provisions for the acquired company's price to be determined on the basis of a combination of factors These include "caps", "floors" and collars Such indeterminate outcomes make the investment manager's analysis more difficult There are also risks relating to liquidity Due to the fact that risk arbitragers as a group may own a large percentage of the outstanding securities involved in the proposed deal, liquidity becomes a greater problem Since these investment managers will also engage in short selling, they must be able to borrow the shares needed to deliver the necessary stock sold This ability to borrow and to maintain the short position is not guaranteed, and if the clearing broker can no longer maintain its loan of securities it may have to close the short sale This could take place at a disadvantageous time These investment managers also engage in foreign securities transactions These may entail regulatory, political and currency risks

Another type of Special Situations Investing involves the purchase of distressed securities (including bonds) that are currently out-of-favor, have low credit ratings or have been affected by adverse factors   In many cases the securities are issued by a company that has declared bankruptcy, is about to declare itself bankrupt, or has recently emerged through reorganization from bankruptcy proceedings   Often, these distressed securities have been issued by reasonably well run businesses that have encountered cash flow difficulties arising from extensive balance sheet leverage   The bankruptcy process permits these companies to restructure their balance sheet   These investment managers follow the proceedings closely, analyzing the various types of securities, particularly liabilities of the companies   These can take the form of secured loans, unsecured loans, collateralized loans, private bank loans and trade claims   These investment managers seek out those liabilities with a greater likelihood of being satisfied through the restructuring, or those which will receive valuable new securities in exchange for the existing creditor claims

Many of the risks noted above also apply to Distressed Securities Investing   Security-specific risk relates to the risk that the security purchased may not be undervalued, and that the bankruptcy proceeding will not reward it as well as the investment manager expected   There are also risks relating to liquidity   Since many of these securities are subject to bankruptcy proceedings, and are unusual, complex and generally non-interest paying, liquidity becomes a greater problem   Where these investment managers engage in short selling, they must be able to borrow the shares needed to deliver the necessary stock sold   This ability to borrow and to maintain the short position is not guaranteed, and if the clearing broker can no longer maintain its loan of securities it may have to close the short sale   This could take place at a disadvantageous time

F     Other     The Trustee may invest Investment Fund assets that are not currently invested in short-term U S  Government securities, money market accounts and/or other short-term interest bearing instruments located at major financial institutions in the United States   Any income earned from such investments will be reinvested by the Investment Fund in accordance with the Investment Fund's investment strategies

The Investment Fund has in the past and expects in the future to invest in investment limited partnerships, limited liability companies, corporations and in accounts managed by Managers located both in the United States and overseas   The Investment Fund expects that Managers will implement the strategies discussed above primarily by means of transactions in securities and commodities listed on exchanges and in the over-the-counter markets located in the United States   The Investment Fund expects that such Managers will maintain the security positions of the investment limited partnerships, limited liability companies and corporations in which the Investment Fund has an interest solely or primarily with United States broker-dealers   The securities positions of the managed accounts and other funds of the Investment Fund are also generally maintained with U S  broker-dealers and/or at U S  commercial banks

MANAGEMENT OF THE INVESTMENT FUND

The Investment Manager

The Investment Manager is responsible for the management of the assets of the Investment Fund The Investment Manager was organized in 1988 as a New York corporation and is currently owned by Dr John P Jeanneret, who is its Chief Executive Officer, and Paul L Perry The Investment Manager (and its predecessor) has served as an "investment manager" for pension and profit sharing plans, as well as numerous other types of employee benefit plans, within the meaning of Section 3(38) of ERISA, since 1974 The Investment Manager is also a Qualified Professional Asset Manager ("QPAM") Currently, the Investment Manager serves approximately 70 employee benefit funds as an "investment manager" The Investment Manager's predecessor became a registered investment adviser under the Advisers Act in 1974 The Investment Manager provides investment advice with respect to more than $500 million in discretionary assets In addition, the Investment Manager serves as investment consultant and/or adviser to additional pension and profit-sharing plans having assets in excess of $500 million See "*CONFLICTS OF INTEREST*"

Dr Jeanneret is 59 years old, and he resides in North Syracuse, New York Dr Jeanneret was awarded the degrees of Doctor of Philosophy, Economics and Finance, at the State University of New York at Binghamton, in May 1976 and has served in the investment advisory and consulting field relating to employee benefit funds since 1973 Dr Jeanneret was previously affiliated with B&K Employee Benefit Funds Service, a firm located in Syracuse, New York, providing investment advisory and administrative services to employee benefit plans

Paul L Perry, a director and owner of the Investment Manager, is a graduate of New York University, with degrees in Finance and in Quantitative Analysis Mr Perry has served in the investment advisory and consulting field relating to employee benefit funds since 1984, and was a Registered Representative with Shearson Lehman Brothers, Inc and Gruntal & Company, before joining the Investment Manager

The Trustee

The Trustee is an FDIC-insured commercial bank located in Princeton, New Jersey, and is wholly-owned by The Bear Stearns Companies Inc The Trustee commenced operations in September 1985 The Trustee holds, as custodian or trustee, over $94 billion of assets for institutional clients and affiliated entities The Trustee's customers include public and private pension funds, mutual funds, banks and insurance companies The Trustee has over $140 million of capital The Trustee's focus is purely institutional and it has no retail business The Trustee provides three major types of service (1) fiduciary, custody and agency services for institutional accounts such as domestic and international employee benefit plans, public retirement funds, mutual funds, insurance companies, foundations, endowments, religious institutions and other substantial accounts, and (2) securities clearance, including clearing of government mortgage and asset-backed securities transactions for institutions and dealers, and (3) commercial lending in connection with securities transactions

The Advisor

The Investment Manager has engaged Ivy Asset Management Corp , a wholly-owned subsidiary of The Bank of New York Company, Inc (the "Advisor"), to (i) research, evaluate and meet with potential investment managers of the assets of the Investment Fund, (ii) make recommendations to the Investment Manager that it invest assets of the Investment Fund with certain investment managers by investing in investment vehicles operated by such investment managers and/or by opening up directly-managed accounts with such investment managers, and (iii) monitor, evaluate and assess performance of investment managers that are managing assets of the Investment Fund and to make periodic recommendations to Investment Manager with respect to such performance The Advisor will also be responsible for certain other administrative, back-office and general support All advice provided by the

Advisor shall be made solely to Investment Manager and all decisions regarding assets of the Investment Fund are made by the Investment Manager in its sole and absolute discretion

       The Advisor is registered as an investment advisor under the Advisers Act   The Advisor is also registered as a commodity pool operator ("CPO") and as a commodity trading advisor ("CTA") pursuant to the Commodity Exchange Act   As of August 1, 2003 the Advisor managed in excess of $7 8 billion of investor capital

       The Bank of New York Company, Inc , a financial holding company ("BNYCo"), is the sole owner of the Advisor   The Bank of New York is the world's largest custodian bank with $7 8 trillion in assets under custody as of June 30, 2003

RISK FACTORS

**THE PURCHASE OF UNITS OFFERED HEREBY INVOLVES CERTAIN RISKS AND IS SUITABLE ONLY FOR OFFEREES OF ADEQUATE FINANCIAL MEANS WHICH HAVE NO NEED FOR LIQUIDITY IN THIS INVESTMENT. OFFEREES SHOULD BEAR IN MIND THE FOLLOWING RISK FACTORS IN ADDITION TO THE RISK FACTORS SET FORTH IN THE SECTION "*INVESTMENT STRATEGIES*"**

Market Risks

1 Competition The securities industry, and the varied strategies and techniques engaged in by the Managers selected by the Investment Manager (see "*INVESTMENT STRATEGIES*") are extremely competitive and each involves a degree of risk The Investment Fund and its Managers compete with firms, including many of the larger securities and investment banking firms, which may in some cases have substantially greater financial resources and research staffs

2 Market Volatility The profitability of the Investment Fund depends upon the Managers chosen by the Investment Manager correctly assessing the future price movements of stocks, bonds, options on stocks, regulated futures contracts and other securities and the movements of interest rates There can be no assurance that the various Managers selected by the Investment Manager will be successful in accurately predicting price and interest rate movements

3 Leverage The Managers selected by the Investment Manager may employ leverage This includes the use of borrowed funds and investments in options, such as puts and calls, regulated futures contracts and warrants Also, they may engage in short sales While such strategies and techniques increase the opportunity to achieve higher returns on the amounts invested, they also increase the risk of loss The level of interest rates generally, and the rates at which such funds may be borrowed in particular, could affect the operating results of the Investment Fund

4 Liquidity A substantial portion of the investments made by the Investment Fund lack liquidity Furthermore, though it is intended that investments by the Investment Fund will be with Managers which invest in securities traded on listed exchanges, some may be thinly traded This could present a problem in realizing the prices quoted and in effectively trading the position(s) In certain situations, Managers may invest in illiquid investments which could result in significant loss in value should the Managers be forced to sell the illiquid investments as a result of rapidly changing market conditions or other factors

5 Independence of Managers The Investment Fund, the Investment Manager and the Advisor do not presently, and do not expect in the future to, control any of the Managers that are selected by the Investment Manager to manage assets of the Investment Fund, their choice of investments and other investment decisions, all of which are totally within the control of such Managers The investments of the Investment Fund are always made pursuant to written disclosures from and/or agreements with a Manager which provide among other things, guidelines by which the Manager will trade for the investment partnership, limited liability company, corporation or managed account, as the case may be Thus, while each Manager undertakes to follow specified trading strategies, it is possible that the Manager could deviate from such undertaking, which deviation could result in a riskier approach that could lead to a loss of all or part of the Investment Fund's investment The Investment Manager and the Advisor, however, will monitor the activities of all Managers selected by the Investment Manager The Investment Manager has a fiduciary responsibility to review the performance of all Managers and is required to exercise due diligence in the selection and monitoring of such managers In addition, while presently neither the Investment Manager nor any of its affiliates own any equity interests in any of the Managers, it is possible that one or more of the affiliates of the Investment Manager will in the future acquire non-controlling interests in one or more of the Managers

6 Counterparty Creditworthiness The Investment Fund engages Managers that deal in securities and financial instruments that involve counterparties Such Managers may also purchase and sell commodity interests in connection with their hedging strategies Under certain conditions a counterparty to a transaction could default or the market for certain securities, financial instruments or commodities may become illiquid In such case, these Managers could experience liquidity problems

7 Short Sales Managers may sell securities short Selling securities short risks losing an amount greater than the proceeds received Theoretically, securities sold short are subject to unlimited risk of loss because there is no limit on the price that a security may appreciate before the short position is closed In addition, the supply of securities that can be borrowed fluctuates from time to time The Managers may be subject to losses if a security lender demands return of the lent securities and an alternative lending source cannot be found

8 Options Managers may utilize options in furtherance of their investment strategies, for the purposes of trading gains or reducing the risk of a portfolio Options positions may include both long positions, where an investment entity managed by the Manager is the holder of put or call options, as well as short positions, where such investment entity is the seller (writer) of an option Although option techniques can increase investment return, they can also involve a relatively higher level of risk The expiration of unexercised long options effectively results in loss of the entire cost, or premium paid for the option Conversely, the writing of an uncovered put or call option can involve, similar to short-selling, a theoretically unlimited risk of an increase in the Investment Fund's cost of selling or purchasing the underlying securities in the event of exercise of the option Appropriate strategies are utilized, when available, to mitigate the risks of such option transactions

9 Systemic Risk World events and/or the activities of one or more large participants in the financial markets and/or other events or activities of others could result in a temporary systemic breakdown in the normal operation of financial markets Such events could result in the Investment Fund's Managers losing substantial value caused predominantly by liquidity and counterparty issues (as noted above) which could result in the Investment Fund incurring substantial losses

Regulatory Risks

1 Strategy Restrictions Certain Offerees may be restricted from utilizing investment strategies of the type the Investment Fund currently engages in and may engage in These may include sales of "naked" options (those in which there is no position in the underlying security) or purchases and sales of put and call options on stocks and sales of regulated futures contracts Offerees should consult their own advisors, counsel, and accountants

2 Trading Limitations For all securities, including options and regulated futures contracts listed on a public exchange, the exchange generally has the right to suspend or limit trading under certain circumstances Such suspensions or limits could render certain strategies difficult to complete or continue and subject the Investment Fund to loss

3 No Registration Neither the Investment Fund nor the Group Trust is registered as an investment company under the Investment Company Act Consequently, the Participating Entities will not benefit from certain of the protections afforded by such statute

Investment Fund Risks

1 Limited Liquidity An investment in the Investment Fund provides limited liquidity The Units are not freely transferable In connection with the purchase of Units pursuant to this Memorandum, each Participating Entity must represent that the Participating Entity has acquired

the Units for investment purposes only and not with a view to or for resale, distribution or fractionalization of the Units The Units have neither been registered under the 1933 Act nor under the securities or "blue sky" laws of any state and, therefore, are subject to transfer restrictions

2 Quarterly Withdrawal of Units Participating Entities may withdraw all or any part of their investment from the Investment Fund, upon at least 60 days prior written notice, as of the last Business Day of March, June, September, and December of each calendar year

3 Frequency of Trading Some of the strategies and techniques employed by the Managers selected by the Investment Manager to manage the assets of the Investment Fund may require frequent trades to take place and, as a consequence, portfolio turnover and brokerage commissions may be greater than for other investment entities of similar size

4 Fees and Expenses The operating expenses of the Investment Fund and Group Trust, including the fees paid to the Investment Manager the Advisor, the Trustee and to the Managers may, in the aggregate, constitute a high percentage relative to other investment entities

5 Equity Allocation While the Investment Manager intends to allocate the Investment Fund's assets among a number of Managers with differing strategies and techniques, there are no fixed allotments There is the risk that one of the strategies or techniques may have a disproportionate share of the Investment Fund's assets

6 No Participation in Management The management of the Group Trust and Investment Fund s operations is vested solely in the Investment Manager and Trustee, and the Participating Entities will have no right to take part in the conduct or control of the business of the Investment Fund or Group Trust In connection with the management of the Investment Fund's and Group Trust's business, the Investment Manager will contribute services to the Investment Fund and Group Trust and devote thereto such time in its discretion as it deems appropriate See "*CONFLICTS OF INTEREST*" The Trustee is a directed trustee and has no discretion to take or not take any action The Trustee is required to follow the instructions of the Investment Manager

7 Indemnification and Liability for False Information and Non-Compliance by Participating Entities Under ERISA, the Investment Manager is a fiduciary and, consequently, is required to exercise good faith and integrity in operating the Investment Fund The Adoption Agreement annexed hereto as Exhibit B" provides that each Participating Entity will, to the extent permitted by applicable law, indemnify and hold harmless the Group Trust, the Investment Fund, Trustee. the Investment Manager, the Advisor, and their respective officers, directors, shareholders, affiliates, agents and employees, from and against any and all losses, liabilities and claims of liability, costs and expenses (including reasonable attorneys' fees and court costs) to which any of them may be subject solely as a result of any misrepresentation by such Participating Entity under the Adoption Agreement or the failure of such Participating Entity to comply with the terms and conditions of the Trust Agreement and Adoption Agreement Furthermore, the Trust Agreement provides that the Investment Manager will not be liable for losses sustained by the Investment Fund unless it is proved that it failed to act with the degree of care skill, prudence, and diligence of a fiduciary under ERISA The Trust Agreement provides that, to the extent permitted by law, the Group Trust will indemnify and hold harmless Trustee from and against any Liability as defined in Section 9 06 of such Agreement that the Trustee may incur by reason of any Participating Entity or the Investment Manager or any other person acting in relation to the Group Trust, except where such Liability arose out of the negligence, bad faith or willful misconduct of the Trustee

8 Management of Investment Fund Assets by Investment Manager The Investment Manager may directly manage up to ten (10%) percent of the assets of the Investment Fund No assurance can

be given nor should any be implied that the Investment Manager will increase the value of Investment Fund assets under direct management or that such assets will not diminish in value

## FINANCIAL SUMMARY OF THE OFFERING

This summary is qualified in its entirety by the detailed information (including "*RISK FACTORS*") appearing in this Memorandum, in the Exhibits and in the documents referred to herein  All documents referred to herein and not attached hereto are available for inspection during normal business hours at the office of the Investment Manager, 100 East Washington Street, Syracuse, New York 13202, upon request by a Participating Entity or its representative

### The Investment Fund

The Units offered herein of the Investment Fund, which was established on December 15 1993 pursuant to the terms of the Group Trust Agreement, will represent the beneficial interest of each Participating Entity in the Investment Fund  The Trustee will maintain an account to which shall be credited the number of Units allocated to each Participating Entity  Each Unit shall represent a proportionate interest in the Investment Fund and no Unit shall have priority or preference over any other

### Terms of Offering

Each Participating Entity must invest a minimum of $1,000,000 (although the Investment Manager has discretion to accept lesser amounts)  Both whole and fractional Units will be sold  The Investment Fund will have no more than 100 Participating Entities at any time  There is no minimum or maximum aggregate amount of funds which may be invested in the Investment Fund  The Group Trust will pay all expenses relating to the sale of Units in the Investment Fund to Participating Entities  The Investment Manager, in its sole discretion, can accept or reject any investment from Offerees and any additional investments from existing Participating Entities

A copy of the Adoption Agreement for purchasing Units is attached as Exhibit 'B'  Each Participating Entity or its duly authorized representative will be required to execute an Adoption Agreement and other documents to be accompanied by payment of the purchase price for the Units being acquired in the Investment Fund

### Determination of Net Asset Value

The net asset value of the Investment Fund ("Investment Fund Net Asset Value") will be determined as of the last Business Day of each calendar quarter (hereinafter individually "Valuation Date")  The Investment Fund Net Asset Value will equal the total value of its assets, including accrued income, minus the total value of its liabilities, including accrued expenses and appropriate reserves as of the Valuation Date  The net asset value of each Unit ("Unit Net Asset Value") will equal the Investment Fund Net Asset Value divided by the number of outstanding Units  Assets of the Investment Fund invested with Managers in (i) partnerships, limited liability companies and corporations operated by the Managers will be valued at the last reported value from each such Manager, and (ii) managed accounts operated by Managers will be valued at the last account statement from each such Manager  Publicly-traded securities will generally be valued by reference to closing market prices on national securities exchanges or generally accepted pricing services selected by the Investment Manager  See Article V of the Trust Agreement annexed hereto as Exhibit "A" for a complete statement of how Investment Fund Net Asset Value is determined

### Distributions

The Investment Fund currently does not expect to make any distributions to the Participating Entities, except pursuant to requests for withdrawal and upon termination of the Investment Fund  Investment Fund income and gains are automatically reinvested

Management Fee

The Investment Manager shall receive a quarterly management fee (the "Management Fee") equal to 0 3125% of the Investment Fund Net Asset Value at the end of each calendar quarter The Management Fee will be calculated and accrued monthly and paid quarterly in arrears (calculated, however, without reduction for the Management Fee attributable to such calendar quarter) A pro rata Management Fee will be charged on any amounts permitted to be invested and redeemed during any calendar quarter The Investment Fund will pay (i) 58% of the Management Fee to the Investment Manager (which will increase to 60% for the calendar year ending December 31, 2005), and (ii) on behalf of the Investment Manager, 42% of the Management Fee (the "Advisory Fee") to the Advisor (which will decrease to 40% for the calendar year ending December 31, 2005) The payment of the Advisory Fee to the Advisor is the sole obligation of the Investment Manager The Advisor has agreed to look solely and exclusively to the Investment Manager for payment of the Advisory Fee The Investment Manager may increase or decrease the percentage of the Management Fee payable to the Advisor, and increase or decrease its percentage of the Management Fee by the same amount, but in no event shall any such actions increase the total Management Fee charged to the Investment Fund

Expenses

The Investment Fund will pay the fees and expenses of the Custodial Trust Company (the "Trustee"), legal, auditing, accounting and all other operating and administrative expenses, including tax on unrelated business taxable income ("UBTI"), if any, and expenses incurred in connection with the offer and sale of units of the Investment Fund (collectively, the "Administrative Expenses")

All expenses incurred in connection with the offer and sale of Units will be borne by the Investment Fund and apportioned among the Participating Entities by reference to the percentage that the aggregate Unit Net Asset Value of all of the Units held by each Participating Entity at the previous Valuation Date bears to the aggregate Investment Fund Net Asset Value at that Valuation Date Units purchased or withdrawn during a calendar quarter will be charged their proportionate share of the Administration Expenses

The fees payable to the Trustee are 0 07% (seven basis points) per annum of the value of the assets of the Group Trust, but in no event less than $5,000 per year The assets of the Group Trust are the aggregate of the assets of the Investment Fund and all other investment funds formed under the Group Trust The Investment Fund will pay a pro rata portion of the fees payable by the Group Trust to the Trustee

The Investment Fund also pays the fees charged by the Managers with whom the Investment Fund invests its assets The fees of the Managers are typically deducted from the gross returns of such Managers Such fees may include brokerage commissions, a percentage of assets managed, a percentage of profits, a fixed fee, or a combination thereof

How to Withdraw

Unless otherwise determined by the Investment Manager in its sole and absolute discretion (which determination can be made on a Participating Entity basis), withdrawal of Units by a Participating Entity may be made as of the close of business in New York on the last Business Day of March, June, September and December of each calendar year (each a "Withdrawal Date") upon at least 60 days prior written notice to the Investment Manager and at the Value per Unit on the Withdrawal Date, less the Management Fee

The Investment Manager is authorized to require any Participating Entity to withdraw all or any of its Units at any time and for any reason upon notice to the Participating Entity All withdrawals will be paid as promptly as reasonably practicable after the Withdrawal Date, subject to the Investment Manager's right to defer payment in certain limited circumstances

## CONFLICTS OF INTEREST

There may be inherent and potential conflicts of interest between the Investment Manager, on the one hand, and the Investment Fund, on the other hand as well as Advisor, on the one hand, and the Investment Fund, on the other hand Among the conflicts which the Offeree should consider are the following

With Respect to the Investment Manager

1 The Investment Manager is not under any obligation to devote its full time to the business of the Investment Fund, but is only required to devote such time and attention to the affairs of the Investment Fund as it may deem appropriate In addition, the Investment Manager manages other accounts and provides investment advice to others for which it is compensated

2 The Investment Manager will determine the allocation of funds from the Investment Fund and such other accounts to Managers on whatever basis it considers appropriate or desirable It is the intention of the Investment Manager to diversify the assets of the Investment Fund among various hedging strategies and Managers

3 The Investment Manager manages other accounts, and it may decide to invest the funds of one or more other accounts, rather than the Investment Fund's funds, with a particular investment manager

With Respect to the Advisor

1 The Advisor, through other entities or accounts that it directly or indirectly controls, advises and/or manages, may utilize the services of independent investment managers which may also invest funds of the Investment Fund and some of such entities or accounts may also utilize some of the investment strategies and techniques used by the Investment Fund

2 The recommendations of the Advisor may be affected by its own requirements for the investment of funds of pooled investment vehicles or other accounts managed or advised by it This may result from limitations as to the amount of funds that a specific investment manager may effectively invest as well as other considerations

3 The Advisor manages other accounts and provides investment advice to other parties, and the Advisor may decide to invest the funds of one or more other accounts or recommend the investment of funds by other parties, rather than the Investment Fund's assets, with a particular Manager

4 The Advisor and its officers, directors, shareholders, affiliates, employees and agents are restricted by an agreement not to compete with the Investment Fund, Group Trust or Investment Manager and not to render investment advisory services to others who may be existing clients of the Investment Manager However, since the Advisor sponsors several programs that are similar to the Investment Fund, this may result in various conflicts of interest between the Advisor and the Investment Manager

## INCOME TAX ASPECTS

The following is a general discussion of certain of the anticipated U S Federal income tax consequences of an investment in the Investment Fund  This discussion is based upon laws, regulations, rulings and decisions now in effect, all of which are subject to change or possibly differing interpretations   **OFFEREES SHOULD CONSULT THEIR OWN TAX ADVISORS IN DETERMINING THE FEDERAL, STATE AND LOCAL CONSEQUENCES TO THEM OF AN INVESTMENT IN THE INVESTMENT FUND PRIOR TO PURCHASING UNITS.**

It is intended that the Group Trust qualify as a "group trust" (under applicable Service rulings and regulations) exempt from taxation under Code Section 501(a)  Accordingly, investments may only be made by eligible plans, trusts, IRAs and governmental units, as described below under "*SUITABILITY REQUIREMENTS*", which are themselves exempt from Federal income taxation  So long as the Group Trust qualifies as a group trust  an investment in the Investment Fund should not affect the tax exempt status of eligible Participating Entities

The Group Trust will be subject to tax on "unrelated business taxable income" in excess of $1,000  "Unrelated business taxable income" is generally defined by Code Section 512(a) to be the excess of gross income from any "unrelated trade or business" (as defined in Code Section 513) conducted by an exempt organization, including income derived from or attributable to certain "debt-financed property" (as defined in Code Section 514(b)), over the allowable deductions attributable to such trade or business and debt-financed property, with certain modifications  These modifications, which are set forth in Code Section 512(b), provide that unrelated business taxable income generally does not include dividends, interest, annuities, royalties and gain or loss from the disposition of property other than stock in trade or property held for sale in the ordinary course of a trade or business, except to the extent such income is derived from or is attributable to "debt-financed property "

Ordinary investment activities undertaken in connection with the management of an exempt organization's securities portfolio generally are not considered to be a trade or business activity of the exempt organization  Whether the Group Trust may be considered to be carrying on a trade or business (as opposed to merely conducting ordinary investment activities), however, is a question of fact  Applying general tax principles at the Group Trust level, the Group Trust may not be considered to be engaged in a trade or business if the objective of the Group Trust is to obtain long-term capital appreciation (although some of the Group Trusts' investment practices may be more characteristic of a trader)

The Group Trust may derive income that may be considered to be unrelated business taxable income in certain cases  In the event the Managers incur indebtedness and use the proceeds therefrom to acquire investments, such investments will be treated as debt-financed property and income from such property will be treated as unrelated business taxable income  In addition, the Managers may enter into certain security repurchase agreements, and may engage in other types of investment practices that generate income that may not strictly be dividends, interest or gains from the disposition of property (although such income may be substantially equivalent thereto)  It is unclear whether income or gains derived from such investment practices constitutes unrelated business taxable income  The IRS could attempt to treat all of an exempt organization's investment income as unrelated business taxable income to the extent that such income is not expressly included in a Code Section 512(b) modification  No assurances can be given that any such income or gains derived by the Group Trust from the investment practices referred to above would not give rise to unrelated business taxable income  Any tax attributable to unrelated business taxable income will be paid by the Group Trust  Returns to Participating Entities will be net of such taxes, if any, and no tax on unrelated business taxable income will be payable by a Participating Entity as a result of its investment in the Investment Fund provided such investment is not "debt-financed"

The Group Trust may invest directly or indirectly in other investment companies that for U S Federal income tax purposes will constitute passive foreign investment companies" or "PFICs" Generally, the Code defines "PFICs" as foreign corporations which meet one or both of the following tests (a) 75% or more of the gross income of the corporation is passive income, or (b) 50% or more of the average value of the corporation's assets consist of assets that would produce passive income U S shareholders of PFICs are subject to special tax rules Although not entirely clear, under current U S income tax law, a tax-exempt entity, such as the Group Trust, that holds shares in a PFIC as a capital asset should not be subject to the tax on unrelated business taxable income with respect to any dividends received in respect of its shareholding and any gain from the disposition of such shares, provided that (i) the Group Trust does not incur acquisition indebtedness in connection with an investment in the PFIC, and (ii) the PFIC is not a "controlled foreign corporation" or "CFC," for U S Federal income tax purposes that has insurance income The PFIC could be a CFC if fifty (50%) percent or more of the shares of the PFIC (measured by voting power or value) were owned by U S shareholders, each owning ten (10%) percent or more of the total combined voting power of such PFIC To avoid being treated as a shareholder of a CFC or a foreign personal holding company, the Group Trust will generally avoid investments in foreign entities where U S persons will own fifty (50%) percent or more of the outstanding shares or, if the foreign entity is a CFC, the Group Trust will own less than ten (10%) percent of the voting stock in such foreign entity In addition, the "interest charge" that can apply under the PFIC rules should not apply to the Group Trust provided a "mark to market" election is not made with respect to its shares and no acquisition indebtedness is incurred in connection with its investment in the PFIC

U S tax legislation has been proposed in the past that would significantly alter certain of the unrelated business taxable income rules and the CFC and PFIC rules described above It is not possible to predict whether any similar legislation will be proposed or enacted in the future, accordingly, a Participating Entity should consult its tax adviser with respect to any proposed U S tax legislation that could affect the U S Federal income tax treatment of an investment in the Group Trust

## ERISA CONSIDERATIONS

The Employee Retirement Income Security Act of 1974, as amended ("ERISA") and the regulations promulgated thereunder by the United States Department of Labor (the "DOL") provide as a general rule that a fiduciary with respect to employee benefit plans ("Plans") subject to ERISA must discharge its responsibilities with respect to a Plan in a prudent manner and must consider several factors in determining whether to enter into an investment or engage in an investment course of action  If a fiduciary with respect to any such Plan breaches its responsibilities with regard to selecting an investment or an investment course of action for such Plan, the fiduciary may be held personally liable for losses incurred by the Plan as a result of such breach  Among the factors that should be considered are the diversification and liquidity of the Plan's portfolio, the potential return on the proposed investment and the place the proposed investment would occupy in the Plan's portfolio taken as a whole

ERISA imposes certain duties and responsibilities on persons (including investment managers) who are deemed to be fiduciaries (within the meaning of Section 3(21) of ERISA) and prohibits them from entering into transactions involving plan assets with various parties in interest (within the meaning of Section 3(14) of ERISA) with respect to the Plan  Generally, under ERISA, the Plan trustees, named fiduciaries or duly appointed investment managers (within the meaning of Section 3(38) of ERISA) have exclusive authority and discretion to manage and control assets of the Plan  If any such "prohibited transaction" is entered into, certain excise taxes may be payable by the party in interest, and the Plan fiduciaries may be liable to the Plan for any losses incurred

The assets of the Group Trust will constitute "plan assets" under regulations promulgated by the DOL  The Investment Manager will therefore be deemed a fiduciary with respect to each investing Plan and the general prudence and fiduciary responsibility provisions of ERISA will be applicable to it and to the operations of the Group Trust  The Investment Manager does not expect that the applicability of these ERISA provisions to the Group Trust will interfere with the operations or the results of the Group Trust in any material way

Certain prospective Participating Entities may currently maintain relationships with the Investment Manager under which the Investment Manager provides investment advisory and/or management services to the Plan  These relationships may cause the Investment Manager or such affiliates to be deemed to be fiduciaries of those Plans  The DOL has issued regulations defining the term "fiduciary" which provide that an investment advisor who renders investment advice to a Plan for a fee and who either has discretionary control over plan assets or renders advice pursuant to an understanding that such advice will serve as a primary basis for the Plan's investment decisions will be deemed a fiduciary but only with respect to that portion of the Plan's assets with respect to which the investment advisor renders such advice or has such discretion  The prior written authorization of an independent fiduciary of any Plan for which the Investment Manager or one of its affiliates acts as investment advisor or has a preexisting fiduciary relationship shall be obtained before assets of such Plan will be invested in the Group Trust  Further, if the Investment Manager acts as investment advisor to a Plan, the Investment Manager will not charge its advisory fee to the Plan with respect to the amount of such Plan's investment in the Group Trust and the Investment Manager will only receive its Management Fee hereunder with respect to the Plan's investment in the Group Trust

## SUITABILITY REQUIREMENTS

The acquisition of Units in the Investment Fund involves a substantial degree of risk See "*RISK FACTORS*" Further, transfer of the Units is not permitted The Investment Manager has adopted as a general investor suitability standard that each Offeree represent in writing that it is an Accredited Investor (as defined in this Memorandum) or Sophisticated Investor (as defined in this Memorandum) The suitability standards referred to above and itemized below represent minimum suitability requirements for Offerees and the satisfaction of such standards by an Offeree does not necessarily mean that Units are a suitable investment for such Offeree

This offering is made for purchase of Units only by (i) "Accredited Investors" as defined by Regulation D ("Regulation D ) as promulgated by the Securities and Exchange Commission and under Section 4(2) of the 1933 Act, and (ii) "Sophisticated Investors", pursuant to an exemption from registration under Regulation D, provided that Units have not been and will not be purchased by more than 35 Sophisticated Investors (calculated as the aggregate number of Sophisticated Investors that have purchased Units as of the date the Investment Fund commenced operations)

In addition to the other suitability requirements set forth herein, an Offeree will only be permitted to acquire Units in the Investment Fund if all of the following conditions are met

(1) such entity is either (A) a trust that is part of a pension or profit sharing plan of an employer and either (i) such trust is exempt, under Section 501(a) of the Code, from United States income taxation by reason of the plan having qualified under Section 401(a) of the Code or (ii) such trust is a governmental plan described in Sections 401(a)(24) and 818(a)(6) of the Code, or (B) an individual retirement account ("IRA") exempt under Section 408(e)

(2) The Group Trust Agreement is incorporated by reference into, and the Group Trust is adopted as part of such plan or IRA

(3) The Participating Entity has entered into an Adoption Agreement with the Investment Manager providing for the admission of such trust or IRA as a Participating Entity

(4) The Investment Manager has certified in writing to the Trustee that the foregoing conditions have been satisfied and has directed the Trustee to admit such trust or IRA as a Participating Entity The Investment Manager shall have sole responsibility for determining that a trust or IRA is eligible to purchase Units of the Investment Fund

An Accredited Investor, under Regulation D of the 1933 Act, includes

(1) An employee benefit plan within the meaning of ERISA

(i) whose investment decision is made by a plan fiduciary, as defined in Section 3(21) of ERISA, which is either a bank, savings and loan association, insurance company or registered investment advisor, or

(ii) having total assets in excess of $5,000,000, or

(iii) if self-directed, the investment decisions are made solely by persons, that are Accredited Investors

(2) An individual retirement account exempt under Section 408(e) of the Code provided that the beneficiary meets one of the following tests

(i) the beneficiary has an individual net worth, or joint net worth with his or her spouse, of at least $1,000,000, or

(ii) the beneficiary has individual income in excess of $200,000 in each of the two most recent years or joint income with his or her spouse in excess of $300,000 in each of those years and has a reasonable expectation of reaching the same income level in the current year

(3) Any plan established and maintained by a state, its political subdivision, or any agency or instrumentality of a state or its political subdivisions, for the benefit of its employees, if such plan has total assets in excess of $5,000,000

A prospective Participating Entity is a "Sophisticated Investor" if it satisfies the following requirements

(1) the person or persons making the investment decision (i) has or have prior knowledge and experience in business and financial matters, including investment in restricted securities, enabling such person or persons to evaluate the merits and risks of purchasing a Unit, and (ii) recognize and understand the nature of the investment in the Investment Fund, and

(2) at the time of the purchase of the Units, the prospective Participating Entity has a net worth in excess of $1 million

Each prospective Participating Entity must complete an Adoption Agreement. which includes representations as to the Participating Entity prior to any purchase of a Unit in order to determine suitability and to determine whether the potential Participating Entity is a qualified Participating Entity

In the Adoption Agreement, an Offeree will also be required to represent that it is not a prohibited country, territory, individual or entity listed on the U S Department of Treasury's Office of Foreign Assets Control ("OFAC") website at **http://www.treas.gov/ofac** and that it is not directly or indirectly affiliated with, any country, territory, individual or entity named on an OFAC list The applicant shall also make a representation that payments to the Investment Fund were not directly or indirectly derived from activities that would violate anti-money laundering laws and regulations In addition, in order to comply with the International Money Laundering Abatement and Anti-Terrorist Financing Act of 2001 (Title III of the USA Patriot Act) and OFAC, certain Offerees will be required to provide additional identity verification information

**THE DELIVERY OF THIS MEMORANDUM TO AN OFFEREE DOES NOT CONSTITUTE AN OFFER, BUT RATHER THE SOLICITATION OF AN OFFER TO BE MADE BY THE OFFEREE, SUBJECT TO ACCEPTANCE BY THE INVESTMENT MANAGER**

SUBSCRIPTION PROCEDURES

In order to purchase Units, an eligible Participating Entity must (1) complete and execute a copy of the Adoption Agreement and Participating Entity Information Statement, (2) deliver the foregoing documents to J P Jeanneret Associates, Inc , 100 East Washington Street, Syracuse, New York 13202 at least 15 days before the Valuation Date, and (3) arrange for payment of the full purchase price of the Units being purchased on or before the Valuation Date If paying by wire transfer, funds should be wired to the Investment Fund's account as follows

Custodial Princeton
ABA #031233338
BNF=Trust A/C #113-50170

OBI=The Master Income-Plus Group Trust Subscription Account

If paying by check, checks should be made payable to "The Master Income-Plus Group Trust" Each subscription will be deemed received upon receipt of immediately available funds in the Group Trust's account All subscriptions, once made, are irrevocable by the subscriber The Investment Manager may reject any subscription if the subscriber does not satisfy the eligibility requirements described above, if any subscription would require registration of the Group Trust or Units under any securities law or for any other reason determined by the Investment Manager

## MISCELLANEOUS

A prospective Participating Entity should review carefully the Trust Agreement governing the Group Trust and the Adoption Agreement (collectively, the "Agreements") attached hereto as Exhibits "A" and "B", respectively   Certain aspects of the Agreements not described elsewhere in this Memorandum are outlined below   However, reference is made to the Agreements for complete details of their terms and conditions

No Transfer of Units

Units may not be transferred or assigned by a Participating Entity

Termination

The Investment Fund may be terminated at any time by the Investment Manager   Upon the termination of the Investment Fund, its affairs shall be wound up, its liabilities discharged and its remaining assets distributed pro rata to the holders of Units as set forth in the Trust Agreement

Reports and Accounting

The Investment Fund's fiscal year ends December 31   After the end of each fiscal year Audited Financial Statements for the year will be prepared by the Investment Fund, audited by the Investment Fund's independent certified public accountants, and will be distributed to each Participating Entity by the Trustee   The Participating Entities will also receive Unaudited Quarterly Statements from the Trustee of the Investment Fund after the end of each calendar quarter (other than the calendar quarter ending December 31) indicating the Investment Fund Net Asset Value

Indemnification of Trustee

The Group Trust Agreement provides that, to the extent permitted by law, the Group Trust will indemnify and hold harmless the Trustee from and against any Liability as defined in Section 9 06 of such Agreement that the Trustee may incur by reason of any Participating Entity or the Investment Manager or any other person acting in relation to the Group Trust, except where such Liability arose out of the negligence, bad faith or willful misconduct of the Trustee